### STARK *v.* STARR.

1. The complainant, Starr, and his brother, being in possession of certain lots in the city of Portland, Oregon, filed a bill in equity in the State court to quiet their title and compel the defendant, who claimed an adverse interest under his patent from the United States, to execute a release to them. Their bill set forth two distinct and independent causes of action, or grounds for relief : one, founded upon an agreement made by the defendant with the parties through whom the complainants claimed, to ratify and confirm the title of such parties; and the other, founded upon a patent of the United States, issued to the city of Portland for land within its limits, in trust for the several use and benefit of the occupants thereof. This patent embraced the premises in controversy, and the complainants claimed as beneficiaries under it. On motion of the defendant, the court held that the two grounds for equitable relief were inconsistent, and compelled the complainants to elect upon which ground they would proceed. They objected to the order, but, under its compulsion, elected to proceed under the city patent, and accordingly amended their bill so as to present their claim for relief solely as beneficiaries under that instrument. The State court held that the patent to Stark was void as against the complainants, and decreed in their favor. On appeal to the Supreme Court of the United States, the decree was reversed, that court holding that the patent to the city was void; and the bill was subsequently dismissed. The defendant having afterwards commenced an action of ejectment for the possession of the premises, and recovered judgment, the complainant, who had in the mean time acquired the interest of his brother, filed the present bill, setting up substantially the same matter respecting the agreement of Stark with the parties through whom he claimed which was originally averred in the first suit; and also that the defendant was estopped by his acts from asserting title to the premises. *Held,* that the proceedings and decree in the first suit did not conclude the complainant in the present suit upon the agreement.

2. The principle that a party seeking to enforce a claim, legal or equitable, must present to the court, either by the pleadings or the proofs, or both, all the grounds upon which he expects a judgment in his favor, and is not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail, does not require distinct causes of action; that is to say, distinct matters, each of which would authorize by itself independent relief, to be presented in a single suit, though they exist at the same time, and might be considered together.

3 Before the laws of the United States were extended over the Territory of Oregon, the settlers in that country had formed for themselves a provisional government, under which they adopted regulations for the possession and occupation of land in the Territory among themselves, although the title to the land was in the United States. Under the regulations, land was occupied, cultivated, and improved, and bought and sold, as if the parties had possessed the fee. The claimants did not, in their dealings with the land, deny the pro-

prietorship of the United States, but they acted upon the expectation that their possessions and improvements would be respected by the government, and that ultimately they should acquire the title; and it was the general understanding of the people, that, whenever the legal title was obtained, it should inure to the benefit of the grantees of the claimant who secured the patent of the United States. This understanding affected all transactions in land until the passage of the Donation Act of Sept. 27, 1850. *Held*, that a purchaser under these circumstances from the claimant, or a person whose purchase from another had been confirmed by the claimant, acquired as against him an equitable right to the land which a court of equity will enforce when he has obtained the patent of the United States; and this equitable right passes to subsequent grantees of the first purchaser or confirmee.

4. Where a ratification by an attorney of a deed of settlement is insufficient in form, because of the manner in which he expressed his agency in appending his signature to the instrument declaring the ratification, a court of equity will look beyond the form of the execution, and, having ascertained his intention in signing the instrument, will, if possible, give it the effect intended, if such ratification has been acted upon by others, and has not been objected to by the principal, when called to his attention.

5. The subsequent action of the principal in asserting a right in severalty to property, which he could only do upon his approval of such ratification by his attorney, will estop him from denying the ratification.

APPEAL from the Circuit Court of the United States for the District of Oregon.

This was a suit in equity, to restrain the defendant from enforcing a judgment recovered by him against the tenants of the complainant, for the possession of certain premises situated in the city of Portland, Oregon, and to compel the defendant to execute a release of his interest to the complainant.

It appears from the record, that on the 22d of March, 1848, and for some time previous, one Francis W. Pettygrove held a claim to six hundred and forty acres of land in Oregon, which was taken up by him under the law of the provisional government, established by the settlers there in 1845, before the laws of the United States were extended over the country. On the land covered by this claim a large part of the city of Portland is built. On the day mentioned, Pettygrove conveyed his claim, with the exception of certain designated lots, to one Daniel H. Lownsdale, of Portland. By the conveyance, the grantor, for the consideration of $5,000, and divers other good causes and considerations, bargained, remised, and released to the grantee named all his " right, title, interest, claim, and

demand at law and in equity, present and in expectancy," in and to the land claim, the boundaries of which were given.

On the 30th of March, 1849, Lownsdale, for the consideration of $6,000, bargained, quitclaimed, and released his interest in the claim, with the exception of certain lots, to Stephen Coffin, designating the interest conveyed, and describing the claim in similar language. With the execution of this conveyance, Lownsdale and Coffin entered into a contract by which Coffin agreed to make every exertion to obtain the title of the United States to the claim, divide the proceeds of any sales of lots or other property or privileges on the land claimed; to bear half the expenses of any improvements they might jointly conclude to make; to further the interest of the town site; to divide the profits and the losses; and that Coffin should execute to Lownsdale a good title to one-half of the claim upon the termination of the contract, which was dissolvable by mutual consent.

On the 13th of December, 1849, Lownsdale and Coffin, for the consideration of $26,666, payable by instalments, conveyed one undivided third part of the claim to William W. Chapman, of Portland. From that time the three parties owned the claim jointly, designating themselves as partners.

During this time, the defendant Stark asserted ownership to one undivided half of the claim, by purchase from one Lovejoy, who, he contended, had held the claim in connection with Pettygrove.

In January, 1850, Lownsdale went to San Francisco, leaving with Chapman a power of attorney to transact and superintend his business in the Territory during his absence; to do any thing pertaining to his interests in Oregon which he, in his judgment, might think advisable, "particularly in signing deeds to Portland lots."

At San Francisco Lownsdale met Stark, and they made a settlement of their respective claims, by which the claim was divided by a line running through what is now called Stark Street; Stark taking the part north of the line, and Lownsdale the part south of it. This settlement was embodied in a deed of release and quitclaim, executed by them on the 1st of March, 1850. By the deed, Stark ratified and confirmed the

conveyances of certain designated lots north of that line, made by Lownsdale or his attorney, previous to the first day of January, 1850, and also all grants and conveyances made subsequently to the first day of March, with a proviso that Stark should receive the proceeds of the subsequent conveyances.

During the absence of Lownsdale, Chapman and Coffin agreed to partition off three blocks among the three owners, assigning one to each owner in severalty, at an agreed valuation. In this way, block 78 was assigned to Lownsdale, block 79 to Coffin, and block 81 to Chapman. This partition, making assignment, was made by the following instrument:—

"This indenture, made and entered into this twentieth day of March, A.D. 1850, between Stephen Coffin, D. H. Lownsdale, and W. W. Chapman, proprietors of Portland, of the first part, and W. W. Chapman, of Portland, Washington County, Oregon, of the second part, witnesseth, that the party of the first part, for and in consideration of the sum of $2,000, the receipt whereof is hereby acknowledged, doth release, confirm, and quitclaim unto the said Chapman the following-described property in the said town of Portland, to wit, lots numbers one (1), two (2), three (3), four (4), in fractional block number eighty-one (81), being the warehouse fraction, and situate east of Water Street, to the water north of Oak Street and south of Pine Street, according to the plat of said town.

"In testimony whereof, the parties have hereunto set their hands and seals day and year aforesaid.

(Signed)    "S. COFFIN.          [SEAL.]

"D. H. LOWNSDALE,    [SEAL.]

"*By his Attorney-in-fact, W. W. Chapman.*

"W. W. CHAPMAN.      [SEAL.]"

Chapman and Coffin first heard, early in April, 1850, of the settlement between Stark and Lownsdale. They at once refused to ratify it, unless the agreement or deed of settlement was modified so as to cover the disposition of property made by them during Lownsdale's absence up to the time they were informed of the settlement.

Stark had left Portland in September of the previous year. Before he left, he executed the following power of attorney, and delivered it to John H. Couch:—

"Know all men by these presents, that I, Benjamin Stark, merchant, resident of Portland, in the Territory of Oregon, do hereby make, constitute, and appoint John H. Couch, of Portland aforesaid (merchant, and my mercantile partner), my true and lawful attorney, for me, and in my stead, to do any and all acts, during my temporary absence from this Territory, which I might myself lawfully do were I personally present, hereby ratifying and confirming all and every act which my said attorney shall so perform, and, by these presents, recalling and annulling all authority conflicting with this letter of attorney, which I have previously given to any person or persons whatsoever.

"Witness my hand and seal, at Portland, this twenty-sixth day of September, A.D. 1849.

"BENJ. STARK.   [SEAL.]

"Witness: WM. SETON OGDEN."

With this power, Stark sent the following letter to his attorney: —

"JOHN H. COUCH, Esq.:

"SIR, — With this you have from me a power of attorney of the fullest character, under which, during my absence from the Territory, you can look out for all my interests, particularly with reference to my interest in the Portland town claim.

"As regards the claim, I wish you to notify Mr. Coffin, as soon as he returns, of the true position of things, and, if possible, have the difficulty concerning my undivided half settled. I have spoken to James W. Nesmith, Esq., and to Mr. Pritchard, Secretary of State, and they will both hold themselves in readiness to act as my counsel.

"Should you find, after the return of Mr. Coffin, that the matter can be brought no nearer to a settlement upon just and equitable principles, I wish you to submit to them (Nesmith and Pritchard) all my papers, a part of which you have herewith, and others which you can have from A. L. Lovejoy, Esq., upon application to him, and direct them to pursue such measures as they deem most judicious.

"Mr. Lovejoy can give some valuable hints to my counsel, as he was formerly my agent. It will be necessary for you to advise the public of your appointment as my attorney during my absence. The proper kind of notice to publish, Nesmith or Pritchard can prepare.

"Wishing you may have but little trouble with my affairs, yet

trusting that you will battle to the utmost for my rights if necessary, I am yours, affectionately,

"BENJ. STARK.

"PORTLAND, 26th September, 1849."

Assuming to act under the authority of this power and letter, Couch undertook to obtain from Chapman and Coffin a ratification of the agreement of settlement between Stark and Lownsdale. For that purpose he consented to the modification demanded by them. Accordingly the agreement was ratified by Chapman and Coffin by the following instrument signed by them indorsed upon the agreement : —

"We, Stephen Coffin and W. W. Chapman, partners with Daniel H. Lownsdale, in the town of Portland, hereby ratify and confirm a certain agreement between Benjamin Stark and D. H. Lownsdale, bearing date the first day of March, A.D. 1850, respecting an adjustment of title, hereby placing the disposition of property up to notice of said adjustment upon the same footing with the disposition of property before the first day of January last.

"In testimony whereof we have hereunto set our hands and seals this the thirteenth day of April, A.D. 1850.

"S. COFFIN.        [L. S.]
"W. W. CHAPMAN.  [L. S.]"

Under this instrument the following ratification by the attorney of Stark was executed : —

"PORTLAND, O. T., April 15, 1850.

"I ratify the above agreement as far as my interest is concerned in said property.

"JOHN H. COUCH,
"*For* BENJ. STARK."

All other material facts are sufficiently stated in the opinion of the court.

The complainant obtained a decree for the release prayed, and the defendant appealed to this court.

*Mr. Jeremiah S. Black* for the appellant.
*Mr. George H. Williams* for the appellee.

MR. JUSTICE FIELD delivered the opinion of the court.
On the 7th of December, 1860, the Commissioner of the

General Land-Office at Washington issued a patent of the United States to the corporate authorities of the city of Portland, Oregon, for lands within the limits of the city to the extent of three hundred and seven acres and forty-nine hundredths of an acre, in trust for the several use and benefit of the occupants thereof. This patent was issued upon an entry made by the city authorities, on the belief that the lands were brought under the operation of the Town-Site Act of May 23, 1844, by the Organic Act of 1848, establishing the territorial government of Oregon, and were not subject to disposition under the Donation Act of 1850. The patent embraced the premises in controversy in this suit, but reserved from its operation any valid claims that might exist in virtue of the several donations to Benjamin Stark and others.

On the following day, Dec. 8, 1860, the Commissioner of the General Land-Office also issued a patent to Stark for land situated within the limits of Portland, claimed by him under the Donation Act, subject, however, to such rights as might exist in virtue of the entry by the city. This patent also covered the premises in controversy.

For several years before these patents were issued, the complainant, with his brother, had been in the occupation, use, and enjoyment of the premises, and had erected upon them expensive and permanent improvements. During this time they asserted, that, by virtue of a certain agreement made by Stark with parties through whom they had obtained their interest, they had acquired a right to have the legal title transferred to them, whenever that was obtained from the United States. After Stark had secured his patent, they applied to him for a release; but he refused to give them one, and threatened them with legal proceedings to recover possession of the premises. They thereupon brought a suit in equity in the State court to compel a release of his interest. In their bill, which was filed in January, 1864, they set forth their long and peaceable possession; that they had made large and valuable improvements; that the defendant asserted title to the premises under his patent, and threatened suits for their recovery; and stated the conveyances under which they claimed, and the agreement upon which they founded their right to a re-

lease of his interest; and they prayed a decree compelling such release.

Subsequently, the bill was amended by the addition of clauses setting forth the patent of the United States issued to the corporate authorities of the city, in trust for the several use and benefit of the occupants, and alleging that the complainants, as beneficiaries, claimed an interest in the premises under that instrument.

The State court appeared to consider these two grounds for equitable relief — one founded upon the agreement of Stark with the parties through whom the complainants claimed, and the other founded upon the city patent — as inconsistent with each other, and compelled the complainants to elect upon which they would proceed. They objected to the order, but, under its compulsion, elected to proceed upon the city patent. The bill was accordingly amended so as to present their claim for relief solely as beneficiaries under that instrument. The point in contention, then, was, which of the two patents carried the title to the premises. If the patent to the city authorities was valid, Stark took nothing by his patent. If, however, his patent was valid, the city had acquired no interest in the premises.

The State Circuit Court and the State Supreme Court held that the patent to Stark was void as against the complainants, and enjoined him from taking legal proceedings to eject th^m from the premises. The case having been brought to this court, the decree of the Supreme Court was reversed, and the cause remanded with directions to dismiss the suit. Upon our mandate the suit was accordingly dismissed in September, 1868. In deciding the case, we held that the act of 1848, organizing the Territory of Oregon, did not extend over the country the Town-Site Act of 1844, and that the patent to the city authorities, being made upon an entry under that act, passed no title to the land covered by the donation claim of Stark. His right to a patent had been previously perfected, and his claim had been surveyed before the passage of the act of 1854, by which the Town-Site Act was first extended with qualifications to the Territory. *Stark* v. *Starrs*, 6 Wall. 402.

After the suit was thus dismissed, Stark commenced actions

of ejectment against the tenants of the complainant for possession of the premises.   These were consolidated into one action, in which Stark recovered judgment, with damages, for use and occupation.   The complainant thereupon commenced the present suit in equity, alleging that he has a good and equitable title to the premises as against Stark, and praying an injunction against any legal proceedings for their possession, and a decree that he be required to release such title as he may have acquired by his donation claim and patent.   In the bill the complainant sets up substantially the same matter, though with greater fullness and detail, which was originally averred in the first suit brought by himself and his brother, and omitted in the amended bill in that suit upon the election required by the court; and also claims that the defendant is estopped by his acts from asserting title to the premises.

The first question presented for our determination is, whether the complainant is concluded upon that matter in the present suit, by reason of the proceedings and decree in the first suit. While that suit was pending, the complainant acquired the interest of his brother.

It is undoubtedly a settled principle that a party seeking to enforce a claim, legal or equitable, must present to the court, either by the pleadings or proofs, or both, all the grounds upon which he expects a judgment in his favor.   He is not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail.   There would be no end to litigation if such a practice were permissible.   But this principle does not require distinct causes of action, — that is to say, distinct matters, — each of which would authorize by itself independent relief, to be presented in a single suit, though they exist at the same time and might be considered together.   The agreement between Stark and the parties through whom the complainants claimed constituted a cause for relief, distinct from and independent of that arising from the interest asserted by them as beneficiaries under the patent to the city authorities.   There was, therefore, no rule of law which compelled the presentation of the two causes of relief in the same suit.   They required different alle-

gations in the bill, and different evidence on the hearing. The court might have considered one cause insufficient, and sustained the bill on the other. It might have ruled against the agreement, and, sustaining the city patent, enjoined the defendant from asserting any interest in the premises; or it might have denied the validity of the patent, and decreed a release upon the agreement. The provisions of the decree would have conformed to the cause sustained; its directions in the one case would have differed from its directions in the other. It was competent, therefore, and within the discretion of the court, to compel the presentation of the two causes, calling as they did for different relief in separate suits. A decision upon one could not possibly be a bar to proceedings upon the other, from their intrinsically distinct nature. Having required the complainants to proceed in that suit only upon one cause or ground for relief, the court left the other cause open for any future suit which they might choose to bring.

To appreciate and give proper effect to the agreement made by Stark with parties through whom the complainant derives his interest, and upon which he founds his claim to equitable relief in this suit, reference must be had to the condition on which land in Oregon was held at that time. The entire land in the Territory belonged to the United States. No provision had been made for the sale or other disposition of any portions of it to private parties. The pre-emption law had not been extended over the country, nor until the passage of the act of September 27, 1850, usually designated as the Donation Act, was there any known mode for obtaining the legal title. And yet the inhabitants dealt in the land as though possessed of the fee. They not only occupied, cultivated, and improved such portions as their necessities required, but they bought and sold it as land is bought and sold where the title has passed out of the government. This dealing in the land without having the title arose necessarily from the settlement of the country before the laws of the United States were extended over it. Indeed, a large number of emigrants from the United States had settled in the country whilst its sovereignty was in dispute with Great Britain. It was not until the 15th of June, 1846, that its sovereignty was determined by the treaty; and previous to this

time, in 1845, the emigrants had formed for themselves a provisional government, under which laws were passed, protection to persons and property secured, and justice administered, with all the order and regularity of long-established communities. The inhabitants engaged in the pursuits, industries, and enterprises which might be expected from an active, intelligent, and moral people. For the preservation of order and security, they were obliged to make some regulations for the possession and occupation of land among themselves. They accordingly established a land system, providing in what manner and to what extent land should be taken up and possessed. Under it each person over a specified age, upon complying with certain conditions, was allowed to hold six hundred and forty acres. He was required to designate the extent of his claim, either by natural or artificial boundaries; make, within prescribed periods, improvements thereon; and have the claim recorded in the office of the territorial recorder, in a book kept for that purpose. All claims thus taken up and recorded were respected by the people; and the claimants were protected, not only by the law of the provisional government, but by the general public sentiment of the country, in their possession and enjoyment. They were at liberty to use the claims for any legitimate purpose as absolute owners, either for cultivation and residences, or as sites for villages or towns. They did not deny, in any of their dealings, the proprietorship of the United States; but they acted upon a confident expectation that their possessions and improvements would be respected by the government, and that ultimately they should acquire the title.* This expectation was founded upon the uniform action of the government in its dealings with the public domain, occupied by settlers in advance of legislation for its sale. It was, therefore, understood by the people that, whenever the legal title was thus obtained, it should inure to the benefit of the grantees of the claimant who secured the patent of the United States. This understanding constituted, in reality, the unwritten conventional law of the State, which affected all transactions in land until the passage of the Dona-

---

* See observations of Mr. Justice Deady, of the United States District Court, on this subject, quoted in *Stark* v. *Starrs*, 6 Wall. 415; and of Mr. Justice Sawyer, of the United States Circuit Court, in *Lamb* v. *Davenport*, 1 Sawyer, 619–622.

tion Act. That act shows that Congress, in its passage, was cognizant of this fact; for it impliedly recognizes the validity of previous contracts for the transfer of land made by a claimant, to whom, upon proof of his settlement and its continuation for four years, a patent should be afterwards issued. This matter was considered by this court in *Lamb* v. *Davenport*, reported in the 18th of Wallace. It was there objected that a contract for the sale of lands thus held, made before the passage of the Donation Act, was void, because the proviso to the fourth section declares that all future contracts of sale by any person entitled to the benefit of the act, before he received a patent, should be void; but the court said, speaking through Mr. Justice Miller: "The act was on its face intended to cover settlements already made, and the careful limitation of this proviso to future contracts of sale — that is, sales made after the passage of the act — raises a strong implication of the validity of such contracts made before the passage of the statute. It was well known that many actual settlers held under such contracts, and while Congress intended to protect the donee from future improvident sales, it left contracts already made undisturbed." And the court held that the purchaser by such a contract acquired, as against his vendor, an equitable right to the land, which would be enforced when the legal title was obtained.

In the present case, it appears that prior to March 22, 1848, one Francis W. Pettygrove held a claim to six hundred and forty acres, taken up under the law of the provisional government, upon which a great part of the present city of Portland is built. On that day he conveyed his claim, with the exception of certain lots, and all his interest therein, "present and in expectancy," to Daniel H. Lownsdale. In March, 1849, Lownsdale conveyed his interest in the claim, with a similar exception of certain lots, to Stephen Coffin, taking back a contract, to the effect, substantially, that Coffin would hold the property equally for his benefit, and execute to him a good title to one-half of the claim, with the improvements, upon the termination of the contract. In December following, Lownsdale and Coffin conveyed one undivided third interest in the claim to Chapman. The three were, in fact, equal owners of the claim, and styled themselves partners in the property, although

the conveyances showed that the documentary title to it was in the names of Chapman and Coffin alone.   These parties, while retaining the general possession and ownership of the claim, laid off upon it numerous blocks and lots, and sold a large number of the lots to different parties, publicly avowing at the time their intention to obtain, if possible, a title to the land from the United States, and thus to perfect the title of the purchasers.

In January, 1850, Lownsdale went to San Francisco, leaving a power of attorney with Chapman, to do any thing pertaining to his interest which Chapman might think advisable, particularly in signing deeds to lots in the city of Portland.   Whilst in San Francisco, he met the defendant Stark, who claimed one-half interest in the Portland land claim by purchase from one Lovejoy, who, he asserted, held the claim originally with Pettygrove.   A settlement was accordingly made between them.   It was agreed that Lownsdale should release, with certain exceptions, all claim to land north of a designated line, now known as Stark Street; and that Stark should release, with certain exceptions, all claim to land south of the line, and confirm certain sales and conveyances made within the tract released to him.   This agreement was carried out by a deed of mutual release and quitclaim executed by them on the 1st of March, 1850.   The deed confirmed the conveyances of certain lots made by Lownsdale or his attorney previous to Jan. 1, 1850, north of the line, and all subsequent conveyances to March 1, 1850; but with a proviso that Stark should receive the proceeds of the subsequent conveyances.   The instrument also provided, that in case any person, with certain exceptions, holding or claiming under Lownsdale, referring to Chapman and Coffin, should refuse to ratify and confirm the deed within six months, Stark might at his option have it cancelled.

Whilst Lownsdale was absent at San Francisco, three blocks were partitioned by Chapman and Coffin among the three owners, one block being taken by each at an agreed valuation. One of them, designated number 78, was assigned to Lownsdale, one, designated number 79, was assigned to Coffin, and one, number 81, was assigned to Chapman.   This latter block lies north of the dividing line, within the tract falling to Stark,

and embraces the premises in controversy. The assignment of this block is contained in a deed purporting to be a conveyance by Chapman, Coffin, and Lownsdale, — the latter by Chapman, his attorney. As a conveyance of any interest to Chapman from Lownsdale, it is waste paper. An attorney cannot convey to himself by a power from his principal. But at that time Coffin, as already stated, held in his name the interest of Lownsdale. The instrument was therefore effectual as a release to Chapman of the entire interest of both. No one but Lownsdale could object to the transaction; and he never complained of it, but, on the contrary, approved of it. In the settlement between the joint owners or partners, Chapman was charged with the estimated value of the block.

When Chapman and Coffin learned of the agreement between Lownsdale and Stark, they refused to ratify it, unless it were modified so as to cover the transfers made by them during Lownsdale's absence, referring particularly to the disposition made of the three blocks. During the previous year, Stark, on leaving Portland, had given a power of attorney to his partner, to do any and all acts during his absence which he could do if present. Accompanying this power was a letter, in which the land claim was mentioned, and a desire expressed that his interest in that claim should be particularly attended to, and the difficulty concerning his undivided half settled. This attorney now undertook to remove the objection urged by Chapman and Coffin, and for that purpose, after some negotiation, he consented to the modification desired. The agreement was accordingly ratified by Chapman and Coffin, modified so as to place the disposition of property made by them previous to the time they received notice of the settlement upon the same footing with the disposition of property before the first of the previous January; and as thus modified the agreement was also ratified by the attorney. Afterwards, during the same year, and in January, 1851, Chapman sold the premises in controversy. A portion of them was purchased from him by the complainant and his brother. The rest of the premises was afterwards purchased by them from intermediate parties. They were all acquired before the patent of the United States was issued to Stark. The different purchasers went at once into

possession; and they or their grantees have ever since, either by themselves or tenants, been in the occupation of the property, and have made extensive and valuable improvements. The property is situated in the business part of Portland, and has always been occupied for business purposes.

The ratification made by the attorney of Stark, it is said, applies in terms only to the attorney's interest; but the answer is, that the attorney had no interest at the time, and acted only for Stark. If, as a ratification by Stark, it is insufficient in form, because of the manner in which the attorney has expressed his agency in appending his signature to the instrument, a court of equity will look beyond the form of the execution, and, having ascertained the intention of the attorney in signing the instrument, will, if possible, give it the effect intended. The ratification, such as it was, undoubtedly led to the purchase of the property by the complainant and his brother and others. When Stark subsequently returned to Portland, in June, 1850, he was informed of the action of his attorney, and made no objection to it, although he understood that it was intended as a ratification on his part of the disposition of the block in question by Chapman and Coffin.

But more persuasive evidence of his approval of the modification is furnished by his action with respect to the property. As already stated, the documentary title to the entire claim was in Chapman and Coffin. Without their approval, the settlement between Stark and Lownsdale would have failed of any result. Upon the ratification by the attorney, Chapman and Coffin abandoned all interest in any other property than block 81 north of the agreed line; and Stark at the same time abandoned his interest in the tract south of that line, and appropriated in severalty all the other property released on the north. In other words, instead of calling for a cancellation of the deed upon the refusal of Chapman and Coffin to ratify it, as he was at liberty to do, he adopted it as approved by them; for, except as thus approved, it was without any efficacy. He held nothing in severalty, except by their consent; and upon his claim to hold the property released in this way he subsequently obtained his patent from the government, and sold to different parties portions of the land. Under

these circumstances, he cannot be permitted to go back upon the act of his attorney.

So far, therefore, as the transfer of block 81 to Chapman is concerned, the deed must be held to apply to it as fully as it applies to the conveyances specially designated and confirmed by that instrument. It operated as a confirmation of the transfer, and gave to Chapman an equitable right to call for a release of the legal title, when that was obtained. That right passed to the complainant claiming under him.

During the several years intervening between this transaction and the issue of the patent, Stark frequently conversed with the Starrs and the other purchasers respecting the property, assured them, in repeated instances, that he would convey to them the legal title when he obtained the patent from the government, and advised them to erect buildings and improve the property. Under his eye, and with full notice, and by his encouragement, the Starrs, and others from whom the Starrs purchased, made the improvements. If in the light of these facts, and all the attending circumstances, the defendant could now successfully impugn the ratification made by his attorney, deny the promises made by himself, and deprive the complainant of the property and improvements, it would be a reproach to the administration of justice. Upon every principle of law and morals, he should be for ever enjoined from the commission of such injustice, and be compelled to quiet the title of the complainant by a release of all claim to the premises.

*Decree affirmed.*

Note. — In *Stark* v. *Starr* and *Same* v. *Bacon*, appeals from the Circuit Court of the United States for the District of Oregon, which were argued at the same time and by the same counsel as was the preceding case, Mr. Justice Field, in delivering the opinion of the court, remarked: " These cases involve some of the questions discussed and decided in the above case ; and, upon the authority of that decision, the decrees in both are affirmed."