## UNITED STATES v. BADEAU.

*(District Court, S. D. New York. December 20, 1886.)*

1. PLEADING—AMENDMENT—CHANGE OF ACTION—ACCOUNT—ACCOUNT STATED.
   Where suit is brought upon a long account claiming a final balance, an amendment will not be allowed at the close of the trial changing the complaint into a claim upon an account stated at a time near the end of the account, for the purpose of excluding corrections of quarterly adjustments, which justice may require to be made.

2. AMBASSADORS AND CONSULS — FEES — WHEN "OFFICIAL" — PAYMENT UNDER MISTAKE.
   The defendant, a consul, was sued for balance of alleged consular fees claimed to belong to the government, and he proved that he had always retained in his hands a sum in excess of the amount claimed, although this amount had in early accounts been credited to the treasury department, and it appeared that the moneys were not in fact official fees, but legally belonged to the consul. *Held*, that the facts did not show a voluntary payment to the government of the fees in question, so as to preclude the defendant from resisting a recovery of the amount erroneously returned in his former accounts; and further, that the ruling of the state department, and the tabular list of' fees promulgated by the president, apparently including the fees in question, until a revision and different ruling by the state department, made the case one of an accounting under a mistake of mixed law and fact, and were not conclusive upon the defendant.

3. SAME—FEES—PERSONAL PERQUISITES.
   The sections of the Revised Statutes in relation to consular acts abroad, consular fees, and the regulations authorized to be issued by the president, are limited to those subjects which belong to the business, the interests, and the jurisdiction of the United States. Fees received by the consul, acting under state authority, and wholly independent of the authority of the United States government, are not official fees as respects the federal government, but the private property of the consul, which he may retain for his own use, and for which he is not required to account to the government.

Action by the United States upon the official bond of Adam Badeau, consul.

This is an action upon an official bond, to recover of the defendant $10,572.64, balance alleged to be due the government on the accounts of the defendant as consul general at London, from July, 1870, to September, 1881. The only matter in controversy related to certain fees which had been collected by the defendant for taking the acknowledgment of deeds, mortgages, assignments, powers of attorney, affidavits, etc., while consul at London, which the defendant claimed were unofficial fees, belonging to him personally. In his quarterly accounts rendered to the treasury department from July, 1870, to September, 1875, the defendant had credited all such fees to the government. In consequence of a ruling made in the department of state about that time, to the effect that fees in the nature of notarial acts, not connected with the business of the government, were "unofficial," and might be retained as such by consular officers, the defendant omitted from his quarterly accounts thereafter all such fees for services performed under authority of state laws, making return, however, for affidavits, etc., taken in the business of the

consulate. On going out of office in 1881, the defendant prepared a detailed statement of all such notarial fees as he claimed to belong to him, under the ruling of the state department, from 1871 to 1875, and submitted this itemized account, amounting to $10,572.64, to the treasury department as a part of his final account. The department refused to allow the charge for these notarial fees. All other items being satisfactorily adjusted, the defendant refused to pay over the balance in his hands, amounting to $10,572.64, claiming that it belonged to him for his unofficial notarial fees from 1871 to September, 1875, and this suit was brought to recover the amount.

The evidence showed that at all times during the consulate the defendant had in his hands a balance considerably exceeding the amount of the notarial fees previously credited to the government in the accounts rendered. Witnesses on both sides testified that consular accounts were running accounts, and not settled until the officer went out of office; also that a considerable item, amounting to $729.32, in the final settlement in 1883, was allowed to the defendant by the department in the adjustment of the accounts in 1883 for a credit due to him in the year 1870. The complaint charged, generally, that the defendant, between the first day of July, 1870, and the sixteenth day of September, 1881, while acting as consul general at London received from sundry persons, sundry official moneys amounting to $10,572.64, which, on demand, he had refused to pay. The answer denied this allegation, and averred that the moneys were moneys received by him for notarial services, were unofficial, and by law belonged to himself. Upon the trial certified transcripts of the accounts in the treasury department were put in evidence, as adjusted quarterly, showing the quarterly balances, and the itemized account of the notarial fees claimed by the defendant as rendered in the final account. The defendant testified that all the items in the account claimed by him were for services done for private individuals in private business, and not under the authority of the United States government, and that all were for use in the individual states of the Union, and under the state laws. At the close of the trial, counsel for each party requested the court to direct a verdict in its favor; counsel for the government contending that the claim was in substance an attempt to recover back money once voluntarily paid to the government; and also that, upon the regulations and the law, the fees belonged to the government. The court directed a verdict for the defendant.

*Stephen A. Walker*, for the United States.

*Stephen G. Clarke*, for defendant.

BROWN, J. At the close of the testimony yesterday a motion was made to amend the complaint by setting up an account stated as of the date of the last quarterly adjustment of the plaintiff's account, as consul, by the treasury department, in 1883. The evidence shows that the treasury department, by making deductions in 1883 that date back to the year 1870, has treated this account as an open account, notwithstanding the quarterly adjustments. Three witnesses have testified that such was the

understanding in regard to consular accounts; that they are running accounts, and are not settled until the officer goes out of office. Upon these facts it would seem that the complaint was drawn intentionally so as to cover the whole period from 1870 to 1881, because the treasury transcript was so made up. As the action is brought for an accounting for the whole period of the consular work in London, the principle that moneys once voluntarily paid cannot be recovered back, does not apply here. The defense does not claim any repayment as an independent cause of action. It simply denies with particularity the averments of the complaint, that so much money is now due and owing to the government,—that is, upon the whole account; and it alleges that the fees or moneys supposed to be due to the government were the property of the defendant. Upon a cause of action of that kind, the whole account being before the court, no case has been submitted to me, and I do not recall any, in which the court has refused to correct any errors which were proved to exist in the whole account that was before it, on either side; and that, as it seems to me, is all the answer that is necessary to that claim; and on that ground I must deny the motion to amend the complaint, or to hold that there was such a settlement as to constitute a voluntary payment.

The other question, as to whether the moneys collected and represented in Exhibit 1 were moneys rightfully retained by the consul, or are to be treated as official moneys for official services, is no doubt a question of some embarrassment. Different views may very easily be entertained on the subject. To some extent this is, I think, in consequence of the different relations which the officer holds to different persons or different jurisdictions. There is very plainly a distinction between the mere acts of an official personage, and official acts, or acts done by that personage officially. Every official personage may do, and does do, a multitude of acts that are not official. It does not make his act official that he signs his title of office; nor, even, as I think, the mere fact that he should add his seal of office, if he has a seal. The question whether it is an official act or not,—whether the act is done officially,—must depend upon other considerations than the mere presence of a formal signature, or even the presence of the print of a seal.

A few illustrations I think will make this clear. Suppose Mr. Badeau, in London, being consul general, observes an advertisement in a newspaper of some western property which he would like to purchase. An entire stranger to the place or to the advertiser, he addresses him on the subject, and signs his name with his title of office; and, as a further indication that he is a responsible person, and the person he professes to be, he might even put the print of his seal on the sheet of paper, or might use paper that bore the heading of the consulate. No one would imagine that an act of that kind was an official act; it would be purely private, for private purposes, as shown by the very nature of the business. The use of the seal might be unauthorized; but if it is not prohibited, no harm would be done, no law would be violated; it would be a mere question of individual taste, or, possibly, of propriety. The use

of the seal would show to the recipient who the person was that addressed him.

To take another step. Suppose two persons in New York have a dispute about some matter of fact in London, Knowing no one there to ascertain the fact, and not even personally knowing the consul, they may agree to let the consul ascertain it, if he will, and write to him to that effect, promising to pay him $10 for his trouble; and at the same time suggest to him, as they do not know him, to add his title, and put his seal to his answer, that they may know that he is the person that they indicate. The consul does it; receives the pay It is purely a private matter; having nothing to do with the business of the consulate, resting purely upon the request of the two persons, and having no legal validity whatever for any purpose; an act done simply to satisfy the two persons concerned as to a fact in London. There again the use of the seal may be unauthorized, though there were no law prohibiting it; it has no official character, and shows only that the person who received the paper, and who signed it, was the man they intended. The consul, the official personage, has done an act; he was requested to do it because he was consul; but, nevertheless, the act was an act wholly unofficial in its relations to the United States.

It is only another step when the court, under the agreement of parties to a litigation, gives a *dedimus potestatem* to a consul in London to take testimony between the parties, and return it under his hand and seal; he acts in that case solely upon the business of the private parties, or of the court. It has nothing to do with the business of the government, or with any proper business of the consulate. He puts his official title and the seal of his office to the return because it is not prohibited, and because it serves to attest the fact that he is the person that the court wished to take the testimony. Nothing in the use of the seal or the title makes the act official in its relations to the government; that is to say, official in the sense of the United States statutes; he acts officially so far as the appointment of the court goes; it is the consular personage that was asked to do the work. So, when a state statute declares that for the purpose of recording mortgages, or deeds, or powers of attorney, persons in London may go before the United States consul and acknowledge such papers in the form prescribed by the state law, and that when he certifies the fact under his hand and seal, they shall be entitled to be recorded; there again is an act done by the consul under an authority wholly in pursuance of a state law. It has nothing to do with the business of the consulate. The seal and the title show that the act is done before the official personage specified in the statute for doing the act. It is not an act of the consulate any more than the other acts above instanced. Therefore it is not an official act in the federal relations of the officer to the United States government.

In the United States statutes we find, I think, a recognition of the various characters in which a consul may act. The first section cited, section 1745, in authorizing the president to prescribe what shall be regarded as official services, adds: "In the business of the several legations;"

that is to say, if it is within the scope of the business that belongs to the legation as business. What is intended? Does it mean state business? Does it mean private business having nothing to do with the United States? or does it mean business that is governed by the United States statutes, and is within the jurisdiction of the United States; subjects of interest to the United States, and about which they are legislating? The next section says that all fees collected by diplomatic and consular officers "for and in behalf of the United States, shall be collected in the coin of the United States." That is apparently a recognition that there may be fees that are not collected in behalf of the United States. Section 1750 is a general authority to consuls "to perform any *notarial act* which any notary public is required or authorized by law to do within the United States," prescribing what shall be the effect of it. The construction given to such statutes, so far as I am informed, and which the court regards certainly as the correct one, is that these statutes relate to such acts as are within the scope of the jurisdiction of the federal government. By this general langauge, acts are not intended which belong to a wholly different sphere. Section 1750 does not intend to authorize the consul to perform notarial acts in regard to matters of state practice or state law only, and which are governed by state law; and, in saying what shall be the force and effect of a consul's notarial act in London, it cannot mean its force in regard to business and subject-matter which belong to the states exclusively to regulate, since that would be usurpation. The construction given to such acts, drawn in general language, is that they relate to subjects that are within the province of the United States government, *i. e.*, to subjects only that are within its jurisdiction. For these reasons my judgment is that not only these three sections of the statute, but the regulations themselves, issued by the president in conformity with section 1745, are all to be construed as referring to those subjects which belong to the jurisdiction, to the business, to the interests of the United States. In other words, they concern federal relations, and not relations which are exclusively individual or state, and which have no reference to the United States business, or to United States interests. When, therefore, the president, defining under this statutory authority to define "what shall be regarded as official services in the business of the several legations," says, by section 312 of the regulations of 1870: "All acts are to be regarded as official services when the consul is required to use his seal and title officially," it means "officially" in relation to the United States, to the business of the United States, to the subjects which are subjects of United States legislation. So that when the consul does an act purely by virtue of an independent sovereignty, purely by virtue of state law, an act which has no force or validity except under a state law,—that act is not official in its relations to the United States, because it has no relation whatever to the United States. I think, therefore, upon the evidence in this case, and the testimony of General Badeau, that all items in Exhibit 1 were for business done under state laws; that so far as the acts of General Badeau, who was simply the consular personage, related to business in which the United States government had no interest what-

ever; so far as they related to subject-matters which were wholly outside of the jurisdiction of the United States; so far as those acts depended for their validity on state laws, or the laws of some other sovereignty than the United States, and he was acting under those laws, and those laws only, those acts are not official acts in his federal relations, and not within the scope or province or intention of either of these statutes or of the regulations of the president. The modified regulations of 1874 I understand precisely in this sense. And it is to be noticed that the clause defining what are "official services," is identically the same in the two sets of regulations; evidently in the new regulations they were not supposed to be contradictory to other provisions. The additional regulations of 1874 were amplifications of the understanding of the state department as to what the consul might do in his individual capacity, or for his individual benefit, although acting as a consul in his relations to an authority from other states, or from other jurisdictions. And these regulations point out specifically that circumstance: that "in doing these acts he is acting entirely outside of the regular duties and responsibility of the consular office, as recited in regulation 321."

Regulation 312 says: "It is to be understood that in such cases the consular officer does not act in his quality of an agent of the federal government, but simply as a citizen of the United States whose local position and character render him available to his fellow-citizens for such services as might have been rendered by a private individual," *i. e.*, an official personage doing those acts under the authority of laws from other states or other sovereignties, which laws might have appointed any private individual to do precisely the same acts. This construction seems to me to be not only in harmony with the settled construction of the United States statutes in limiting them to the subjects of federal jurisdiction, but also to be entirely just and beneficial. The consul's acts, in these matters are wholly voluntary; there is no obligation upon him to do these acts, if they are such as I speak of. And if he is under no obligation whatever to do them, if they are entirely outside of the consular business, the government has no interest in the question whether the acts are done or undone. What equity, therefore, is there in the government's demanding the fees for his labor? Congress might, of course, prohibit his doing such acts; they might prohibit the use of the seal as evidence that he had done them; but it is for congress, and not the court, to say how far he may be permitted to use the seal.

It is for the convenience of American citizens, possibly of others, that services of this kind should be done to some extent by the consul, or by some one in his position. He is under no obligation to do them; and if he is not to be paid anything for doing them; if his fees are to be returned to the government, that wholly discourages the doing of such acts, and would naturally lead to their discontinuance, and to the inconvenience of our citizens to that extent. Whenever congress makes it the duty of the consul to do certain acts, then those acts become official by virtue of that obligation; but so long as it is left entirely voluntary, I see no reason in the claim that the fees for what is done voluntarily, at some

trouble and cost to the officer, outside of the business and interests of the government, should be returned as official fees belonging to the government.

For these reasons I think the verdict should be for the defendant on the evidence as I have assumed it to be, viz., that the acts of the consul in the matters embraced in Exhibit 1 were all done under state laws, resting for their validity upon state laws, and not upon any statute of the United States, and having no reference to any business of the United States, or to any federal relations; and the verdict will be so directed.

## ON MOTION FOR NEW TRIAL.

Brown, J. Upon the exceptions argued before me upon this motion, only the same points have been presented that were submitted at the trial; although they have been argued with greater fullness and detail. I am not satisfied that there was any material error in the conclusion reached at the trial.

As regards the first point, that moneys voluntarily paid could not be recovered back, further argument has not supplied any authority showing that that principle has ever prevented the correction of an account rendered so to accord with justice, when the suit itself was not brought upon an account stated, but was brought for a balance alleged to accrue during the whole period, and when the proofs show that the plaintiff had treated the account as an open one, by making corrections going back to the beginning. In speaking of the case at the trial as though the moneys collected for the notarial fees now claimed by the defendant to belong to him had been actually paid over to the government, too much was, perhaps, apparently conceded to the plaintiff. But the fact that it was distinctly proved at the trial that the defendant had always retained in his hands more than the amount of these notarial fees now recharged against the government, would indicate that no payment of these specific fees had been actually made to the government, unless the moneys which were paid over were now so applied as to be deemed a payment of the notarial fees which the defendant had credited to the government in his previous accounts, rather than the payment of other items in the same account. There was no evidence, however, to show that any particular application of the moneys previously paid over to the treasury had been made, either by the plaintiff or by the defendant. Under such circumstances, the rule is stated by the supreme court in *Bank* v. *Bank*, 94 U. S. 437, 439, as follows: "The rule settled by this court as to the application of payments is that the debtor or party paying the money may, if he chooses to do so, direct its application; if he fail, the right devolves upon the creditor; if he fail, the law will make the application according to its own notions of justice. Neither of the parties can make it after a controversy upon the subject has arisen between them and a *fortiori* not at the trial." The court being at liberty, therefore, to apply the payments "according to its own notions of justice," if it finds that the notarial fees in question were the property of the defendant, will treat the balance that all the time remained in his hands, (the same being always in excess of

those fees,) as including the notarial fees that belonged to him; and on that application, the case would not be one of any previous voluntary payment, and hence not a claim to recover anything back. Aside from the treatment of this account as an open one, both by the treasury department and by the form of the action, it is not clear to me that if the fees were deemed turned over to the government in the form of accounts rendered, they should be treated as payments under a pure mistake of law only, so as to preclude all correction in the final accounting. The regulations promulgated by the president, with the tabular list of fees containing the same general description of items as those here considered, go far to make the case one of at least mixed fact and law, and to a certain extent analogous to that of *U. S.* v. *Lawson*, 101 U. S. 164, in which the requirements of a superior officer were held to prevent the application of the rule. In reality these fees were returned by the consul in his accounts in consequence of a mistake as to the meaning and intent of the regulations, which were binding orders promulgated by the president through the state department. In that view the mistake was a mistake of fact. 1 Story, Eq. Jur. § 130; *Pitcher* v. *Turin*, 10 Barb. 436. That mistake was corrected by the ruling of the state department in 1874; and justice, at least, requires that the account should be allowed to be corrected at any time before final settlement; and I find no authority to the contrary.

As regards the other point urged, the court ruled upon the trial that the burden of proof was upon the defendant to prove what were the items included by mistake in the prior accounts, and that their character was such as showed that they belonged to him, and not to the government. It is urged that the defendant did not prove this, because, as it is said, the acknowledgments or affidavits might have been taken under the authority of section 1750 of the Revised Statutes, for use either in the United States courts, in the District of Columbia, or in the various territories of the United States; and in that event, as they would derive their whole authority and effect from the United States Statutes, they would fall within the regulation of the president, and within the definition of official fees belonging to the government, as laid down by the court at the trial. An examination of the testimony of the defendant does not seem to me to leave opportunity for this question to be raised. The defendant's direct examination showed with considerable minuteness the nature of the notarial acts in question, and stated that they were for use in the individual states, under state authority, and not under any authority of the United States. It was not necessary, and would have been tedious for the defendant in the first instance, to undertake to go over every one of these several thousand items and say the same thing of each. Had the plaintiff desired to question the general fact testified to, it had opportunity to cross-examine the defendant as to any or all of the items. The defendant testified that in making up the itemized account, the separation of those that were unofficial and under state authority from those that were deemed official charges was made with scrupulous care, and with great labor. Some items relating to ex-

tradition proceedings, and therefore connected with federal relations, supposed to be in the list, were found on cross-examination not to be included in it. The cross-examination did not show any mistake in the defendant's general statement as to all of these items.

No error being perceived in directing a verdict, the motion for a new trial should be denied.