### CLARK et al. v. WHEATLEY et al.

(Circuit Court of Appeals, Sixth Circuit. May 2, 1922.)

No. 3619.

1. **Accord and satisfaction** ☞2(2)—**Damages for misrepresentation in sale.**

Where a purchaser of oil leases, on tracts on two of which there were existing wells, discovered that the seller had materially misrepresented the production of the wells on one tract, and in consideration of such fact, and without taking measures to ascertain the facts as to the other wells, asked and obtained a modification of the contract, such action constituted an accord and satisfaction of any claim for damages because of the misrepresentation discovered, and also of like misrepresentations as to the production of the other wells, which should have been, and in fact were, anticipated by him.

2. **Specific performance** ☞53—**Misrepresentations in sale held not to bar suit for specific enforcement of contract.**

The right to maintain a suit for specific enforcement of a contract of sale of oil leases *held* not defeated by the fact that complainant made misrepresentations in the sale, where the purchaser, after knowledge of such misrepresentations in part, and without inquiry as to their extent, asked and obtained a modification of the contract on that ground.

3. **Mines and minerals** ☞74—**Shortage in acreage of leases entitles purchaser to reduction in price.**

A shortage in acreage of oil leases sold *held* to entitle the purchaser to a reduction of the purchase price.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit in equity by Charles A. Wheatley and others against F. Huntington Clark and others. Decree for complainants, and defendants appeal. Modified and affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Wheatley was the owner of oil leases covering three associated tracts of land in Eastern Kentucky, said to contain in the aggregate 187 acres. Upon one of the tracts three oil wells had been drilled. Upon what was known as the Loomis property, adjacent to this tract, there were two producing wells, and there were many others in a territory extending up to this property. Wheatley negotiated with Clark for the sale of these three tracts, resulting, on December 6, 1919, in a contract with Clark to buy them for $40,000, which was to be paid $10,000 down, $15,000 upon the delivery of the conveyance, and the remaining $15,000 by the first oil to be produced. Clark paid the $10,000, and a little later other payments, leaving unpaid $10,000 out of the $15,000 cash, and $13,000 out of the last $15,000. The contract had been made as the result of one brief inspection visit and in reliance upon Wheatley's statements. When Clark came to take possession of the property for developing he found, so he says, that the wells upon the Loomis property, instead of producing 10 barrels each per day, as Wheatley had represented, were really producing a total of only 10 barrels per day. He did not at that time get further information as to the three wells on the purchased tract. They had been pumped by Wheatley only for a short time, for the purpose of demonstrating their production, and had then been closed until suitable power for permanent pumping should be available. Clark says that this discovery as to the Loomis wells indicated to him that his production would be smaller and lower than had been expected, but did not destroy his faith in the property as being worth the purchase price or more. Accordingly he wrote to Wheatley on December 17th, making complaint of this and another similar misstatement, saying that he was advised that he could refuse further payment and proceed to recover the amount already paid, or could make the remaining payment and claim damages, but that he did not wish to take any such course; that he thought, perhaps, Wheatley had not intentionally misrepresented; and that he (Clark) might still make a success of the lease, if he could use the first proceeds of the oil for further drilling, instead of for paying the remaining $13,000; and that, if Wheatley would consent to postpone for a year the appropriation of the oil to the payment of the $13,000, he (Clark) would pay the remaining $10,000 due upon the delivery of the conveyance, and accept the transfer, and go on with the contract.

Wheatley accepted this proposition, and Clark made the payment. He proceeded immediately to drill two more wells in the immediate vicinity of the three existing ones. The reason which he assigned for not proceeding at once to pump these three is that he ordered a power plant for that purpose, but it was long delayed in coming, and in the meantime he proceeded with the two additional wells; the power plant being appropriate to pump all five. Neither one of the new wells indicated that it would make any substantial production. When the pumping plant was installed, it could produce from the five wells a total of only 3 barrels per day. After some further efforts, by changes in the apparatus and methods, the failure continued, and it is a matter beyond doubt that the five wells had been and are substantially worthless as producers. Thereupon Clark proceeded to develop another one of the three tracts covered by the contract, and there he found oil such that the production in November, 1920, at the then prevailing price of oil, was upwards of $200 per day, thus indicating, at the value per barrel of production stated by Clark, a producing valuation of $75,000 to $100,000, in addition to values undeveloped.

As the end of the year's extension came and the time approached when the oil would begin to be appropriated to the $13,000 debt, Clark made complaint. He claimed that the misrepresentation as to the three wells had led him into the loss of $12,000 in drilling the two more immediately adjacent, and that the title to 10 acres of the tract had failed. He therefore refused to proceed with the arrangement for paying the $13,000 out of the oil. Wheatley then began this suit in the court below as one for specific performance of the contract, claimed a lien upon the oil proceeds, and upon his motion a receiver was appointed, who received and accumulated the proceeds of the oil, and upon final hearing there was a decree in Wheatley's favor, and the receiver

was directed to make payment to Wheatley accordingly. From this decree Clark appeals.

Chester Gourley, of Beattyville, Ky., and Albert H. Morrill, of Cincinnati, Ohio (Gourley, Gourley & Parrish, of Beattyville, Ky., and Gordon, Morrill & Ginter, of Cincinnati, Ohio, on the brief), for appellants.

S. D. Rouse, of Covington, Ky., for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). For the purposes of this opinion, at least, we assume that there was substantial misrepresentation of fact by Wheatley, which gave Clark the right to elect either to rescind or to affirm and have a right of action for damages caused. This misrepresentation was, first, as to the production from the Loomis wells, which production served as an indication of value in the nearby acreage which was being sold; and, second, as to the output of the three Wheatley wells, which showed existing value in the wells themselves, and also served as an indication of what might be expected in the vicinity. Before December 17th Clark discovered that as to the Loomis wells he had been deceived, in that the representation made was two-thirds false. He says he fully understood that very likely the statements as to the Wheatley wells were proportionately exaggerated. In other words, he not only had reason to believe, but he did believe, that the output of both the Loomis and Wheatley wells had been exaggerated by Wheatley in a way that must have been intentional deception or equivalent recklessness. Nevertheless, he thought, as he says, that, even if these three wells produced only a total of 20 barrels per day, his bargain, as a whole, was one he wished to keep. His counsel now insist that he did not know that these three wells were worthless, and that, when he acquired knowledge that the fraud had gone to an extent thus far beyond what he had formerly supposed, he could maintain an action based upon the final complete disclosure.

For the purposes of this opinion, also, we may concede that, when we consider the right to recover damages for the fraud, as distinguished from the right to rescind, neither lack of diligence in discovering the fraud nor delay, short of the statutory limitation, in bringing suit therefor, is of any importance. We are not dealing here with a vendee's mere election to affirm, and resulting waiver of his right to rescind, nor with that waiver of the right to sue for fraud which results from merely proceeding with an executory contract after knowledge of the fraud, but which waiver is rightly confined to the fraud of which the vendee then had knowledge (or, perhaps, should have had knowledge), and does not continue to bar the action when other fraud is subsequently discovered. Pryor v. Foster, 130 N. Y. 171, 29 N. E. 123; Estes v. Odom, 91 Ga. 600, 18 S. E. 355.

[1] We have here a case of accord and satisfaction. The contract itself was in no way separable, as between the different tracts, or as between production and prospects. If Clark was deceived as to the facts, he had a right of action. Whether he was deceived in one or

two or three particulars, as to production or as to prospects, might affect his damages to be recovered in that action; but he did not acquire a new right of action every time he discovered that the misrepresentation had been more extreme than he had supposed. We are not now dealing even with a case where the known and the later discovered frauds related to different parts of the same subject-matter. Clark says he assumed that there had been misrepresentation as to the output of the Wheatley as well as of the Loomis wells, and if he had brought an action then (December 17) he would doubtless have alleged deceit as to both.

Fully understanding he had this right of action, Clark voluntarily released it, in exchange for a new consideration satisfactory to him. The payment of the $13,000 was at least postponed until the next year, and, in addition to this mere postponement, it was evident that the payment might relatively be greatly delayed—as has happened by the great drop in the price of oil from 1920 to 1921—and also that it might be lost through being subject to the contingency of production extending over into 1921. The price Clark received was thus substantial as well as satisfactory; he cannot sell his action, and keep it, too. Neither could Clark's cause of action for deceit be split, and a part of it be satisfied and the remainder continue to exist. Stark v. Starr, 94 U. S. 477, 485, 24 L. Ed. 276; R. C. L. "Actions," § 22, note 17.

[2] We conclude, therefore, that in the face of his new contract Clark could not maintain an action for the additional damages which he might thereafter learn existed, because of additional deceits then unknown to him, but of the same character and pertaining to the same items. If there was material fraud still concealed from him when he made the new contract, that contract itself might be tainted, and his remedy would be to proceed to have that contract set aside. No such issue has been formally made in this case, and yet the claim that the bill should be dismissed, because Wheatley has come into a court of equity to get its aid in carrying out a fraudulent contract, and the thought that Clark's failure to proceed affirmatively to vacate his settlement ought not to prejudice him when the same situation arises defensively, lead us to very much the same point as if Clark had asked relief in this respect. True, Wheatley resorted to a court of equity; but he is, after all, enforcing a legal right. Apparently he could have sued Clark at law, as for conversion. It is only after balancing the equities of the parties in the whole transaction that a court of equity can decide whether the defendant's are so dominant that the plaintiff ought to be denied its aid to enforce a legal right with which defendant had deliberately vested him.

In this balancing we discover, first, that the whole transaction was in a highly speculative field, and both parties knew that they were dealing in the end with values which were almost guesswork. That an oil well has a stated production to-day is only a symptom of the value of the well and nearby acreage, and that a well has a settled production is, after all, largely a matter of opinion. In such a field, the principles governing actions for deceit or the equitable rights of the parties may not be different from those in other fields; but their application calls

for great caution. We next observe that, upon the whole transaction, Clark is not shown to have suffered any loss, but, so far as the record indicates, has made a large profit. This is not controlling, but it is important in deciding whether, in equity, Clark should be excused from his part of that contract which has brought him this profit, and that, too, after he had elected not to rescind, and so had kept Wheatley out of a chance to get it. We next observe that, if Clark were appealing to equity to set aside his settlement contract, he would be called upon to explain why he did not proceed promptly. He waited at least six months after he was fully informed before he made any complaint to Wheatley, and his explanation that he was waiting until he could bring the suit and make service in Kentucky is not wholly satisfactory for this purpose.

Finally, we cannot doubt that, when Clark made his accord and satisfaction, he was reasonably bound to know, and probably did anticipate, the full extent of the misrepresentation of which he later complained. He had no right to suppose that the misrepresentation as to the different wells was carefully confined to the same arithmetical basis. An immediate investigation as to the three Wheatley wells would have been the natural thing. Slight inquiry from those near by would seemingly have brought the information that these wells were nonproducers. No reason appears why he could not have connected the wells with the Loomis power, as Wheatley had done, or supplied some other temporary power, for a little test pumping. His conduct strongly suggests that he did not wish to have more definite knowledge of the extent of the deception, which might have led to his abandonment by his associates; but he preferred to go on with the enterprise on the chance that in the end it would turn out well. While his lack of diligence in discovering the full misrepresentation may have no abstract bearing on his right of action for deceit, it does have a bearing upon his standing in a court of equity. Upon the whole, we think the aid of equity, to the extent now asked to carry out the settlement agreement, should not be refused.

[3] Clark's complaint as to the 10-acre shortage is of another character, and we do not see that it is covered by the new contract. Under some circumstances, a good title to such a fraction of the acreage might be a vital thing, so that its absence might defeat the contract; but that is not asked here, and damages can be fairly well computed. There seems to be no reason for fixing the value of this acreage at less than $100 per acre, and Clark claims no more. He should therefore have a rebate of that amount, to be applied upon the $13,000. To that extent the decree below should be modified. In other respects it is affirmed.

The appellants will recover the costs of this court.