JOHNSON & JOHNSON v. HEROLD et al., Revenue Collectors.

(Circuit Court, D. New Jersey. July 31, 1907.)

1. JUDGMENT—RES JUDICATA—SPLITTING CAUSE OF ACTION—INTERNAL REVENUE—ACTIONS TO RECOVER TAXES PAID.

A manufacturer of surgical supplies, which purchased internal revenue stamps from time to time under protest for use on articles made and sold by it, may maintain different actions against successive collectors to recover the amounts paid to each, and different actions against the same collector, when required to prevent the bar of limitations, or when they relate to different classes of articles, and the questions involved may be different, and a recovery in one such suit is not a bar to the prosecution of the others pending, where no motion has been made to consolidate.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 30, Judgment, §§ 1107–1114.]

2. INTERNAL REVENUE—STAMP TAXES—RECOVERY—INVOLUNTARY PAYMENT—SUFFICIENCY OF PROTEST.

Where plaintiff was a large purchaser and user of internal revenue stamps, and there was a constant dispute between it and the department whether certain articles manufactured by it were subject to tax, it was not essential that it enter a formal protest every time it purchased stamps in order to preserve its right to recover the amount paid for stamps used on such articles.

3. JUDGMENT—CONCLUSIVENESS—DISMISSAL OF WRIT OF ERROR.

The fact that a writ of error was sued out to review a judgment which was dismissed by the appellate court because not taken in time does not affect the conclusiveness of such judgment between the parties as to the questions actually put in issue and decided therein.

4. SAME—RES JUDICATA.

Where different actions are brought by the same plaintiff to recover internal revenue taxes paid under the same law on the same class of articles, a judgment in one case is conclusive in the others.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 30, Judgment, §§ 1244–1247.]

5. INTERNAL REVENUE—WAR REVENUE TAXES—STAMP TAXES ON MEDICINAL PREPARATIONS.

Medicinal plasters, made after a standard formula, which are not sold under a trade-mark nor any claim of exclusive right nor of special merit, are not advertised to cure any disease, and are without directions for use, are not taxable under Schedule B and section 20 of the War Revenue Act

161 F.—38

of June 13, 1898 (30 Stat. 456, 462, c. 448 [U. S. Comp. St. 1901, pp. 2297, 2306]). Plasters described as "dental" merely, because cut in very small pieces suitable for dentists' use, are not within the statute, nor are finger hats nor corn or bunion plasters, the action of which, when applied, is purely mechanical, and not medicinal; but plasters described as "Johnson's" or as "rheumatic" may be regarded severally as proprietary and as recommended as a remedy for rheumatism, and are taxable.

6. SAME—ARTICLES "COMPOUNDED."
    The provisions of War Revenue Act June 13, 1898, c. 448, § 20, 30 Stat. 456 (U. S. Comp. St. 1901, p. 2297), that the stamp taxes provided for in Schedule B "shall apply to all medicinal articles compounded by any formula, published or unpublished," but that they shall not apply to any uncompounded medicinal drug or chemical, contemplate a compound made after some formula and a natural product, such as papain, which is prepared from the juice of the pawpaw and cannot be made artificially, although it may be a chemical compound, is not "compounded" within the meaning of the statute, and is not taxable, whether used as the basis of a plaster, or prepared in the form of tablets or pills by being mixed with an excipient which has no medicinal effect.

    [Ed. Note.—For other definitions, see Words and Phrases, vol. 2, p. 1372.]

At Law. On contract.

Willard P. Voorhees and Archibald Cox, for plaintiffs.

John B. Vreeland, U. S. Dist. Atty., and Theodore Booraem and H. P. Lindabury, Asst. U. S. Dist. Attys., for defendants.

CROSS, District Judge. These actions have been brought to recover sums of money paid by the plaintiffs to the defendants, as successive collectors of internal revenue for the district of New Jersey, for stamps affixed by the plaintiffs to certain articles manufactured by them, which articles were claimed by the United States to be subject to stamp taxes provided for by section 20 and Schedule B of the act of Congress of June 13, 1898 (30 Stat. 456, 462, c. 448 [U. S. Comp. St. 1901, pp. 2297, 2306]), entitled, "An act to provide ways and means to meet war expenditures and for other purposes." There are in all 16 different suits, of which five are brought against Rutan, late collector, and are designated on the record as C, D, E, G, and H; five against Herold, collector, designated as C, D, E, G, and H; and six others against Herold, collector, designated as $B^2$, $C^2$, $D^2$, $E^2$, $G^2$, and $H^2$. Each designated class, as for instance class C, C, and $C^2$, comprises the same group of articles, and the three actions embrace different periods of time during which stamps were imposed upon the articles comprised in such group. The other suits, designated B and B, were originally instituted by the plaintiffs in this court, one against Rutan, collector, and the other against Herold, collector, upon which final judgments have been entered. The remaining sixteen cases designated as above have been tried together before the court pursuant to stipulation without a jury, upon the same evidence so far as applicable. I find the facts from the evidence to be as follows:

(1) That the plaintiff, Johnson & Johnson, Incorporated, is a manufacturer of surgical supplies at New Brunswick, N. J., and has been for a number of years past, and between July 1, 1898, when the war

revenue act went into effect, and July 1, 1901, they manufactured and sold the different articles enumerated in the declarations.

(2) Between July 1, 1898, and March 1, 1899, the defendant William D. Rutan was collector of internal revenue for the Fifth district of New Jersey, and from the 1st day of March, 1899, until the 1st day of July, 1901, the defendant Herman C. H. Herold was collector in said district.

(3) That between the 1st day of July, 1898, and the 1st day of July, 1901, the plaintiff purchased large quantities of internal revenue stamps from the said defendants; purchases made between July 1, 1898, and March 1, 1899, being made from the defendant William D. Rutan, and during the balance of said period from the defendant Herman C. H. Herold. A part of the stamps purchased during the whole period were affixed on the articles mentioned in said declarations and canceled, such stamps being so affixed and canceled under rulings of the said defendants and the Commissioner of Internal Revenue of the United States that such articles were subject to a tax under the provisions of the act referred to, and the sums so paid for said internal revenue stamps by the plaintiff to the defendants were paid under protest and on threat of distress and confiscation in case of refusal, and not voluntarily. For the sums thus paid claims were duly presented by the plaintiff and disallowed.

(4) On June 29, 1900, the plaintiff began twelve suits on claims theretofore presented and disallowed; six suits, designated B, C, D, E, G, and H, against the defendant Rutan for the amount of internal revenue stamps so affixed and canceled during the period from July 1, 1898, to March 1, 1899, and six suits designated $B^1$, $C^1$, $D^1$, $E^1$, $G^1$, and $H^1$, against the defendant Herman C. H. Herold, to recover the amount paid for internal revenue stamps so affixed and canceled during the period from March 1, 1899, to January 1, 1900. Suits B against the defendant Rutan and $B^1$ against the defendant Herold have been heard and determined by this court; final judgment having been entered therein on the 12th day of June, 1903.

(5) That on the 27th day of December, 1901, plaintiff began six suits against the defendant Herman C. H. Herold, on claims presented and disallowed between July and December, 1901, designated suits $B^2$, $C^2$, $D^2$, $E^2$, $G^2$, and $H^2$, to recover the amount of internal revenue stamps so affixed and canceled during the period from January 1, 1900, to July 1, 1901.

(6) There are three suits in each class, for example, C Rutan, $C^1$ Herold, and $C^2$ Herold, concerning the same class of articles stamped during different periods during which the said act was in force. The remaining sixteen suits, designated as above, have been tried together before the court, pursuant to a stipulation in writing, without a jury.

(7) In the actions above mentioned heretofore litigated and determined between the parties hereto, this court entered final judgment that the plaintiff was entitled to recover the amount paid by the plaintiff to the defendants under the identical circumstances under which payment was made herein and as part of the same transaction for stamps affixed and canceled upon certain plasters which, in every

respect, were identical with the plasters involved in the action now before the court, designated Class B, which actions determined the following questions:

(a) That the payments were not voluntary.

(b) That the plaintiff has not and does not claim to have any exclusive right or title to the making or preparing the plasters. That the plasters are not prepared, uttered, vended, or exposed for sale under any letters patent or trade-mark, or held out or recommended to the public by the plaintiff as proprietary medicines or medicinal proprietary articles or preparations or as remedies or specifics for any disease, diseases, or affection whatever affecting the human or animal body, or put up in style or manner similar to that of patent, trade-mark, or proprietary medicines in general, or advertised on the package or otherwise as remedies or specifics for any ailment or as having any special claim to merit or to any peculiar advantage in mode of preparation, quality, use, or effect.

(c) That the use of plaintiff's trade-mark as it is used on said plasters did not render them liable to taxation.

(d) That the amount paid as taxes on said articles should be returned to the plaintiff.

(8) That the following articles, to wit, all the articles in class C, and all the articles in class D, and the capsicum, strengthening, porous, belladonna, and belladonna and capsicum plasters in class E, and the belladonna plaster in class H, not designated "Johnson's" each and all present no question not actually litigated and determined in the aforesaid actions between the parties hereto.

(9) That the plaintiff has withdrawn the claims for the taxes paid on the following articles in class E: Dr. Scott's electric plasters; Phœnix plasters; Dr. McLean's plasters; hop plasters; Collin's voltaic plasters; cuticura plasters; kidney plasters (under buyer's name); zonas corn leaf; camphenol; zonweiss; baby powder; Wood's penetrating plaster; Red Cross toothache plaster; Red Cross kidney plaster; canthos plaster; Red Cross cough plasters; first aid to wheelmen.

(10) The following articles are each and all purely mechanical in their purpose and operation and are not medicinal articles or preparations: Finger hats; Dr. Don's corn plasters; Dr. Don's bunion plasters.

(11) The plasters in class E to which the word "dental" is applied are identical with the other plasters of the same name, except that they are cut in small pieces and in convenient form for the use of dentists. The word "dental" does not describe or indicate any disease or affection.

(12) That "Papoid Powder" and "Papoid Tablets" in class G are the simple drug papain, the purified juice of the carica papaya (alone and with an excipient, which is purely mechanical and not medicinal, respectively), and are uncompounded drugs.

(13) That the claims on the articles in class G named "Papoid and Nux Vomica" and "Papoid and Boracic Acid" have been withdrawn by the plaintiff.

(14) That with the exception of the articles mentioned in findings 5 and 9 as withdrawn, in finding 6 as mechanical and not medicinal, and the "Rheumatic Plaster" in class E, and that "Belladonna Plaster" in class H, which bears the word "Johnson's," and the papain preparations in class G, all the articles involved in these actions are in fact:

(a) Not plasters wherein the person making or preparing the same has or claims to have any private formula, secret or occult art for the making or preparing the same, or has or claims to have an exclusive right or title to the making or preparing the same. On the contrary, they are manufactured and prepared according to formulas taken from the United States or National Dispensatory or the British Pharmacœpia, all well-known publications of accepted authority, and are standard medical preparations recognized and constantly prescribed by the medical profession, the merits of which are discussed in medical text-books and journals and are the same plasters made according to the same formulas as prepared and sold under the same names by other manufacturers in competition with the plaintiff.

(b) They are not prepared, uttered, vended, or exposed for sale under any letters patent or trade-mark, or held out or recommended to the public by the plaintiff as proprietary medicines or medicinal proprietary articles or preparations, or as remedies or specifics for any disease, diseases, or affection whatever affecting the human or animal body, or put up in style or manner similar to that of patent, trade-mark, or proprietary medicines in general, or advertised as remedies or specifics for any ailment or as having any special claim to merit or to any peculiar advantage in mode of preparation, quality, use, or effect. On the contrary, they are sold under the standard Pharmacœpia names, which are the equivalents of formulas and the names used by the text-books and medical profession and other manufacturers to describe the same plasters by whomsoever produced, and they are represented to be nothing except the standard remedies they in fact are.

### The Law.

The defendants have raised a question which, as it is in a sense preliminary, will at once be disposed of. They contend that whatever rights of action the plaintiffs had against each defendant in reality constituted but one, and that consequently they should all have been embodied in a single suit against each defendant; or, in other words, that, having but one cause of action, the plaintiffs had no right to split it, but, having done so, and recovered in two of the suits, they must be deemed to have waived the remainder of their demand and to be estopped from any recovery on account thereof. The defendants admittedly did not raise this question upon the trial of the earlier actions, or indeed upon the trial of these, until the briefs of counsel were filed. The position is untenable. It is obvious from the record that, if suit had not been brought until all of the causes of action had matured, many of the earlier items would have been barred by the statute of limitations. Moreover, the causes of action in the later suits had not arisen when the first suits were instituted.

The suits were begun at different times against successive collectors, and embraced different periods during which the war revenue act was in force, and the stamps were purchased for which recovery is sought. As to all such suits as were pending at any given time, the defendants might, under the practice act of this state, have moved before issue joined, had they so desired, to have them consolidated, and courts will do this whenever necessary to prevent vexation and oppression. The defendants apparently have been in no wise injured or embarassed in making their defense by the maintenance of several suits instead of one. Not infrequently the question of a multiplicity of suits is largely one of costs; but, as in these cases there can be no costs against the defendants, that reason may be eliminated. The division of the articles which were taxed into six groups, and the maintenance of suits thereon for taxes paid during different periods of time to the different collectors, was, whatever else may be said of it, certainly not the splitting of an individual cause of action, and such procedure undoubtedly aided at the trial not only in giving direction to, but in the comprehension of, the evidence. The rule invoked by the defendants is only applicable where there is an indivisible demand. Baird v. United States, 96 U. S. 430, 432, 24 L. Ed. 703. The point is further considered in Stark v. Starr, 94 U. S. 477, 24 L. Ed. 276, where, at page 485 (24 L. Ed. 276), Mr. Justice Field, in delivering the opinion of the court says:

"It is undoubtedly a settled principle that a party seeking to enforce a claim, legal or equitable, must present to the court, either by the pleadings or proofs, or both, all the grounds upon which he expects a judgment in his favor. He is not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail. There would be no end to litigation if such a practice were permissible. But this principle does not require distinct causes of action—that is to say, distinct matters—each of which would authorize by itself independent relief, to be presented in a single suit, though they exist at the same time and might be considered together."

Furthermore, the rule is for the benefit of the defendant and may be waived. Claflin & Kimball v. Mather Electric Co., 98 Fed. 699, 39 C. C. A. 241.

As already said, it cannot be that the plaintiffs were required to permit the bar of the statute of limitations to intervene, as to any part or parts of their demand, in order that but one suit should be brought against each collector. My conclusion therefore is that the plaintiffs' demand was divisible, and that recovery in the present actions is not barred for the reason stated.

The further point is raised by the defendants that the moneys paid by the plaintiffs for stamps, which they are seeking to recover, were paid without protest and voluntarily, and that therefore the suits must fail. The plaintiffs contend, however, that this question is, as between the parties hereto, res judicata, by reason of the judgments entered in the former suits; but assuming, for the purpose of argument, that it is not, I think the evidence shows that the payments were made under protest, and were not voluntary. It is quite impossible to read the evidence upon this point without reaching that

conclusion. Even before the act became operative, a representative of the plaintiffs went to Washington with samples of all the articles and preparations manufactured by them, and the question of their liability to the stamp tax was gone over with the Internal Revenue Commissioner, or his deputy. The department decided that the articles here involved were taxable, and wrote a letter to that effect, which came to the plaintiffs through one of the defendants, and from that time on until the act was repealed the liability to taxation of these various articles and preparations was one of active and constant argument and dispute between the plaintiffs and the Revenue Department, and defendants. Protests were repeatedly made by the plaintiffs, both verbally and in writing, to the Revenue Department and to the collectors, and the plaintiffs were informed by the department that, if the articles which were declared by the department to be subject to taxes were sold or exposed for sale without the requisite stamps, such action would be at their peril, and that all such unstamped articles would be seized and confiscated, and as a matter of fact there is evidence that some were so seized. Under the circumstances, it was wholly unnecessary for the plaintiffs to enter a protest with the collectors each time they purchased a stamp or stamps. Indeed, such action would have been well nigh impossible, since they were constantly using stamps in large quantities, not only upon the disputed articles, but also upon very many other articles about which there either never had been any dispute, or, if there had, it had been adjusted. There was never at any time any doubt between the plaintiffs and the department and defendants as to which of their preparations the plaintiffs claimed were not, and which the department claimed were, subject to stamp duty, and it was to these disputed articles that the protests, verbal and written, were directed, and were understood by the defendants to be directed.

Two cases are specially relied upon by the defendants to support their position, viz., Chesebrough v. United States, 192 U. S. 253, 24 Sup. Ct. 262, 48 L. Ed. 432, and United States v. New York & Cuba Mail Steamship Co., 200 U. S. 488, 26 Sup. Ct. 327, 50 L. Ed. 569, but they do not seem to me to control the question under consideration, or indeed to have much bearing upon it.

In the first case mentioned, Chesebrough purchased stamps from a collector of internal revenue without intimating the purpose for which they were purchased, and without any protest made, or notice given at the time, that the purchaser claimed that the purchase was made under duress, and that the law requiring their use was unconstitutional. Under such circumstances, it was accordingly held that the purchase was purely voluntary, while in the other case substantially all that was decided that can be claimed to be pertinent appears in the second syllabus, in the following language:

"Affixing stamps required by the war revenue act of 1898 to the manifest of a vessel in order to obtain the clearance required by section 4197, Rev. St. (U. S. Comp. St. 1901, p. 2840), without presenting any claim or protest to the collector of internal revenue from whom the stamps are purchased, or to the collector of the port from whom the clearance is obtained, is not a payment under duress, but a voluntary payment, and the amount paid for the stamps cannot be recovered either on the ground of the unconstitution-

ality of the provisions of the war revenue act, requiring the stamps to be affixed, or under Act May 12, 1900, c. 393, 31 Stat. 177 (U. S. Comp. St. 1901, p. 2276), providing for the redemption of stamps used by mistake."

In the cases above referred to the plaintiffs interpreted the law to suit themselves, and then as an afterthought attempted to recover the taxes paid. In all such cases the authorities are unanimous in holding the payments voluntary.

In the case of Swift & Co. v. United States, 111 U. S. 22, 4 Sup. Ct. 244, 28 L. Ed. 341, it appears that the plaintiff did not even protest against the payment of stamp duties on matches, but settled periodically with the Treasury Department pursuant to an established course of business. Referring to this practice, the court said:

"From this statement it clearly appears that the Internal Revenue Bureau had at the beginning deliberately adopted the construction of the law upon which it acted through its successive commissioners, requiring all persons purchasing such proprietary stamps to receive their statutory commissions in stamps at their face value instead of in money; that it regulated all its forms, modes of business, receipts, accounts, and returns upon that interpretation of the law; that it refused on application, prior to 1866, and subsequently, to modify its decision; that all who had dealt with it in purchasing these stamps were informed of its adherence to this ruling; and, finally, that conformity to it on their part was made a condition, without which they would not be permitted to purchase stamps at all. This was, in effect, to say to the appellant that, unless it complied with the exaction, it should not continue its business, for it could not continue business without stamps, and it could not purchase stamps except upon the terms prescribed by the Commissioner of Internal Revenue. The question is whether the receipts, agreements, accounts, and settlements made in pursuance of that demand and necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on its statutory right. We cannot hesitate to answer that question in the negative. The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction, or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid or other value parted with, under such pressure, has never been regarded as a voluntary act within the meaning of the maxim: 'Volenti non fit injuria.' * * * If a person illegally claims a fee colore officii, the payment is not voluntary so as to preclude the party from recovering it back. Morgan v. Palmer, 2 B. & C. 729. In Steele v. Williams, 8 Exch. 625, Martin, B., said: 'If a statute prescribes certain fees for certain services, and a party assuming to act under it insists upon having more, the payment cannot be said to be voluntary.' 'The common principle,' says Mr. Pollock (Principles of Contract, 523), 'is that if a man chooses to give away his money, or to take his chances whether he is giving it away or not, he cannot afterwards change his mind; but it is open to him to show that he supposed the facts to be otherwise, or that he really had no choice.' Addison on Contracts, 1043; Alton v. Durant, 2 Strobh. 257."

Moreover, the character of the protest is not of vital importance. In Wright v. Blakeslee, 101 U. S. 174, 179, 25 L. Ed. 1048, the court, speaking by Mr. Justice Bradley, says:

"No such written notice or protest is required of a party paying illegal taxes under the internal revenue laws. He must pay under protest in some form, it is true, or his payment will be deemed voluntary (citing cases); but whilst a written protest would in all cases be most convenient there is no statutory requirements that the protest shall be in writing. In the present case the court merely finds that the payment of the tax and penalty was made under protest which may have been either written or verbal. We think that this finding is sufficient to show that the payment was not voluntary."

In Philadelphia v. Collector, 5 Wall. 720, 18 L. Ed. 614, the court, at page 731 of 5 Wall. (18 L. Ed. 614), says:

"Where the party voluntarily pays the money he is without remedy; but if he pays it by compulsion of law, or under protest, or with notice that he intends to bring suit to test the validity of the claim, he may recover it back, if the assessment was erroneous or illegal, in an action of assumpsit for money had and received."

The same doctrine is enunciated in Erskine v. Van Arsdale, 15 Wall. 75, 77, 21 L. Ed. 63, where the court says:

"Taxes illegally assessed and paid may always be recovered back, if the collector understands from the payer that the taxes are regarded as illegal, and that suit will be instituted to compel the refunding of them."

It is clear, in the cases at bar, that there was no misunderstanding between the parties upon this point. Neither the collector nor the Internal Revenue Department could have been under the impression, for a single moment, that the taxes were being paid by the plaintiffs voluntarily and without protest. There were a number of very decided protests and disagreements between them, which continued, with varying degrees of intensity, throughout the whole period during which the stamps were purchased. Furthermore, it was unnecessary, as I have already intimated, for the plaintiffs to continually protest. They protested sufficiently often to show that there was no acquiescence in the demands of the government officials, anything beyond that was not required. It would, moreover, be somewhat difficult to indicate what else the plaintiffs could have done to show that they were stamping certain articles involuntarily and under protest and duress.

Coming now to the merits of the case, I would say, at the outset, that in so far as applicable I shall accept the reasoning and conclusions reached by Judge Archbald, in his opinion in the earlier cases, decided in this district, and reported in 122 Fed. 993 and 123 Fed. 409. Many of the questions presented and argued in these cases will thereby be disposed of, and there will remain to be dealt with such articles and preparations only as seem substantially differentiated from those adjudged by him to be nontaxable. But before entering upon such discussion, it may be well to consider the matters which the plaintiffs claim are absolutely res judicata. In the cases decided by Judge Archbald, to which reference has been made, writs of error were sued out upon the judgments, which, however, upon hearing were dismissed by the Circuit Court of Appeals, for this circuit, upon the ground that the writs were not taken out within six months after the entry of the judgments, and consequently the court had no jurisdiction. 130 Fed. 109, 64 C. C. A. 443. Such dismissal, however, in no wise prevents those judgments from being res judicata, as to all such matters here in controversy as were actually decided therein, and upon which such judgments or findings were based. Hubbell v. United States, 171 U. S. 203, 210, 18 Sup. Ct. 828, 43 L. Ed. 136. The writs of error, having been sued out too late, were absolutely inoperative upon the judgments below. Jurisdiction was never conferred upon the court of review. The operation and effect

of the judgments· were never for a moment interrupted or suspended by the void writs. Hence whether these cases were rightly or wrongly decided below makes no difference in their power to estop herein the parties and their privies as to all such matters as were actually and necessarily litigated and decided therein and thereby (Wilson's Ex'r v. Deen, 121 U. S. 525, 534, 7 Sup. Ct. 1004, 30 L. Ed. 980; Adams v. Crittenden, 133 U. S. 296, 298, 10 Sup. Ct. 304, 33 L. Ed. 623; New Orleans v. Citizens' Bank, 167 U. S. 371, 398, 17 Sup. Ct. 905, 42 L. Ed. 202), and the existence or nonexistence of a right in either party to have the judgment in the prior suit re-examined upon appeal or writ of error cannot in any case control the scope of the estoppel (Johnson Company v. Wharton, 152 U. S. 252, 261, 14 Sup. Ct. 608, 38 L. Ed. 429).

Under the circumstances therefore there are at least two points raised in these suits which I think must be considered res judicata, viz.: That the trade-mark, used as the plaintiffs used it, did not render the articles taxable under the act; and that the payments for stamps were made involuntarily and under duress. Notwithstanding this conclusion, the latter point has already been discussed upon the evidence, and it has been determined that the taxes were paid under protest and involuntarily. As to the former question, that the use of the trade-mark and the initials J. & J. upon the packages are res judicata, I see no reason whatever to doubt. These matters were directly in controversy in the earlier suits, and were considered and passed upon by the court necessarily and under the conditions and circumstances now presented. The stamps were all imposed under the same act, upon like classes of articles between the same parties and during successive periods of time. In New Orleans v. Citizens' Bank, supra, the court said, at page 396 of 167 U. S., at page 913 of 17 Sup. Ct. (42 L. Ed. 202):

"The proposition that because a suit for a tax of one year is a different demand from the suit for a tax for another, therefore res judicata cannot apply, whilst admitting in form the principle of the things adjudged in reality substantially denies and destroys it. The estoppel resulting from the thing adjudged does not depend upon whether there is the same demand in both cases but exists, even although there be different demands, when the question upon which the recovery of the second demand depends has under identical circumstances and conditions been previously concluded by a judgment between the parties or their privies. This is the elemental rule, stated in the text-books and enforced by many decisions of this court. A brief review of some of the leading cases will make this perfectly clear."

In Baldwin v. Maryland, 179 U. S. 220, 21 Sup. Ct. 105, 45 L. Ed. 160, the same principle is enunciated, and is clearly indicated in the earlier case of Beloit v. Morgan, 7 Wall. 619, 19 L. Ed. 205, where, upon page 622 of 7 Wall. (19 L. Ed. 205), the following language is used:

"The court had full jurisdiction over the parties and the subject. Under such circumstances a judgment is conclusive, not only as to the res of that case but as to all further litigation between the same parties touching the same subject-matter, though the res itself may be different."

As to matters which may not be strictly res judicata, I shall follow, as already stated, the opinion of Judge Archbald. There re-

mains therefore comparatively little for me to add. In so far as the articles stamped are identical, and that is true of those included in the suit B², the doctrine of res judicata must prevail, while as to the suits in class C it is enough to say that they comprise the same articles as class B, except that in class B the plaster was packed in a roll, whereas in classes C the rolls of plaster were cut for use into small parallelograms and were packed in cases in that form, a dozen or more in a case. There is no apparent distinction between the taxability of these two classes under the statute. In character, directions for use and general mode of putting them up, they are alike. If one is taxable, both are, and, if one is not, neither is, and the same may be said of the suits in class B. Class E comprises a miscellaneous collection of articles. Some of the articles comprised in this class omit the plaintiffs' name and trade-mark, and in lieu thereof give the name of some druggist for whom they were manufactured. The articles are made after a standard, and not a secret formula, and there is no exclusive right to make them. The packages manifest no trade-mark or semblance of trade-mark, no advertisement of any disease which it is alleged they will cure, no claim to special merit, no directions for use, and no name other than a pharmaceutical one. They seem to me to be entirely outside of the statute. It is true they are put up in packages, and so too are "proprietary trade-mark and patent medicines"; but this alone cannot settle the question of taxability, since the evidence shows that patent or quack medicines are put up in every conceivable form. The taxability of other articles in class E must be determined by the question whether they are mechanical or medicinal. These articles are referred to in the testimony as finger hats, corn plasters, and bunion plasters, and it establishes conclusively that they are purely mechanical. They serve to protect a finger, a corn or bunion, as the case may be, from injury or outside pressure. An ordinary finger stall used to protect a cut finger illustrates the use of them all. There is not a word of testimony to show that they are medicinal. Other articles in classes E are described as "dental" capsicum plasters and "rheumatic" plasters. Referring to the testimony, we find that "dental" capsicum plasters are identical with the other capsicum plasters, except that they are cut in very small pieces and in convenient form for the use of dentists. The mere fact that the word "dental" may indicate their use for the teeth is of no weight, since it does not describe or indicate any disease of the teeth, or other disease, for which they may be used. I think, however, that "rheumatic" plasters were properly taxable. It is true the word "rheumatic" is not the name of a disease, but it is so directly and inseparably connected with the name of a disease that it may be fairly held that the plasters so styled are advertised as remedies for rheumatism, which is a disease. To call a plaster a rheumatic plaster is equivalent to calling it a plaster for rheumatism. There were other articles specified in classes E which were required to be stamped, but they were voluntarily withdrawn by the plaintiffs at the trial.

Classes G and H require more extended consideration. As to the articles included in the class G, it is claimed, on behalf of the plain-

tiffs, that they are within the proviso of section 20 of the act, which reads, "provided that no stamp tax shall be imposed upon any uncompounded medicinal drug or chemical," and that the fact that they are thus included is emphasized affirmatively by a subsequent portion of the same section, which says, "the stamp taxes provided for in Schedule B of this act, shall apply to all medicinal articles compounded by any formula published or unpublished," etc. It would appear, therefore, that the compounding contemplated by the act is a compound made after or pursuant to a formula, whether published or unpublished, and the weight of the evidence establishes that "compound" implies intelligent action after, or according to, a formula. The word is used in a pharmaceutical sense. United States v. Studds (D. C.) 91 Fed. 610, and so understood the evidence shows that compounding would be usually, if not invariably, after a written formula. The classes G under consideration have to do with the drug papain, and the evidence establishes that there is no formula by which papain can be made. It is prepared from the juice of the pawpaw plant. It is a natural product, and the evidence shows that nothing but nature can produce it. Papoid is a name for the simple drug papain, and it is not compounded. It may be a chemical compound, but it is not compounded by chemists or pharmacists, after a formula or otherwise; nor can it be. If its constituent elements were resolved by chemical analysis, they could not be reunited to form papain.

In the case of Rose v. State of Ohio, 11 Ohio Cir. Ct. R. 87, the court found as a matter of fact that "Baker's Cocoa" contained nothing which was not a part of the cocoa bean, but resulted from converting that bean by removing the hulls and drying and baking into what is known as "cocoa-nibs," and then extracting therefrom a considerable part of the fat or oily matter, and then grinding the remainder into a powdered substance, and the question presented for decision was whether the article was a "mixture" or "compound," and, after referring to the dictionary definitions of "mixture" and "compound," the court said:

"A fair interpretation of these definitions would not seem to include within any one of them any natural product, though, considered chemically, that natural product may have various ingredients. If we are to say that every article is a mixture or compound which has, chemically considered, more than one ingredient, then we would make every fruit of the earth a compound. Certainly we should make the cocoa bean a mixture or compound. But clearly, a fair interpretation of the meaning of the words 'mixture' and 'compound' in the statute is something resulting from the putting together of parts or ingredients other than as nature has put them together in the fruits of the earth. And if this interpretation is correct, then to say that the article sold by Rose is a mixture or compound, we should be driven to say that the taking of an ingredient from that which is not a mixture or compound leaves a mixture or a compound remaining. It would seem a very strange thing if that from which we take something is not a mixture or compound, that when we take something from that article what remains is a mixture or compound."

The evidence conclusively establishes, to my mind, that papoid is the simple drug papain, the purified juice of the pawpaw plant, and that it is uncompounded. Classes G, however, embrace also papoid tablets and papoid pills. These tablets and pills are composed of the

simple drug papain in the powder form, mingled with an excipient to hold the powder together in the particular form desired. Sugar of milk is used for that purpose. Its effect, according to the evidence, is purely mechanical. It performs the same function as the base of a plaster. In the selection of an excipient the desire is to select one without medicinal quality, and the testimony shows that sugar of milk is of this character, and that it has no medicinal quality except possibly what is inherent in every food. It is a food, and not a medicine. The defendant's expert witness admitted that the vehicle in which drugs are put for the purpose of administration is mechanical, and not medicinal, and that the whole object in view in selecting an excipient is to procure one having as little medicinal effect as possible, so as not to alter the effect of the drug. Papain therefore, whether sold as a powder or in tablets or pills, was a simple drug, and not subject to taxation. In each and every of the forms mentioned it was uncompounded, within the meaning of the act.

Coming now to the articles comprised in the classes designated H, we find included therein belladonna plasters which are identical with the plasters of the same name included in class B, and, being so, are subject to the same adjudication. All of the questions pertaining to them are res judicata. There are, however, included in suits H, other plasters known as "Johnson's Belladonna Plasters," which in certain respects differ from the others. Schedule B, appended to the war revenue act, taxes medicinal proprietary articles and preparations under certain specified conditions. Included in the list of articles liable to taxation, if any one of those conditions is met, are "plasters." It is necessary therefore to determine whether the plasters under consideration fall within any one or more of the prescribed conditions which render them taxable. Among those conditions are the following: When the articles are held out, or recommended to the public, by the makers, vendors, or proprietors thereof, as proprietary medicines, or medicinal proprietary articles or preparations, or as remedies or specifics for any disease, diseases, or affection whatever affecting the human or animal body. It seems to me the plasters were taxable for the reason that they meet the conditions of the statute just stated. They were held out to the public by the makers as medicinal proprietary articles. They were made and sold as "Johnson's Belladonna Plasters." This in effect made them proprietary. "Proprietary" means belonging to, or pertaining to, a proprietor. The word necessarily implies absolute or qualified ownership. Johnson's plasters are Johnson's, and nobody's else, and they cannot be anybody's else. It is not equivalent to saying "belladonna plasters made by Johnson." "Smith's house" and a "house made by Smith" have a widely different meaning. If one speaks of "Smith's house," he recognizes that house, as in some sense, Smith's; but, if he speaks of a "house made by Smith," there is absolutely no implication of ownership in Smith. Furthermore, each plaster is inclosed in a wrapper, and the purchaser's attention is directed to certain testimonials in the following language: "Note these important indorsements." Immediately thereunder one person says that he is "greatly pleased" with them, and

that they have a quicker and better effect "than any other he has used," and another person, after stating that he has tested them for "skin-diseases," finds "increased action and more immediate effect." By printing these testimonials on the wrapper of each plaster, the proprietors adopted them as their own, and in effect recommended them for skin diseases. They were also spoken of as "touching the spot," as "excellent," "uniform," etc., and this was puffing them as the evidence shows patent or quack medicines are uniformly puffed. These plasters meet face to face some of the conditions of Schedule B of the war revenue act. The cases of Ferguson v. Arthur, 117 U. S. 482, 6 Sup. Ct. 861, 29 L. Ed. 979, and United States v. Eisner & Mendelsohn Co., 59 Fed. 352, 8 C. C. A. 148, lend color to the views I have expressed.

Summarizing my conclusions, then, I find that the plaintiffs are entitled to recover for stamps illegally exacted upon the articles described in the remaining action in class B (that is the action styled B²), also in the actions in classes C, D, E, and G (excepting rheumatic plasters in class E), and finally upon the articles in class H, except those described as "Johnson's Belladonna Plasters." What I have just said, however, does not, of course, apply to such articles in the various suits as have been voluntarily withdrawn from consideration by the plaintiffs. No proof was produced to show what amounts the plaintiffs would be entitled to recover in the several actions, if entitled to recover at all, for the reason that it was stipulated and agreed between the counsel of the parties that the causes should be referred to a referee or commissioner to compute the amount to be recovered in each suit, after the merits of the cases had been determined by the court.

Pursuant to such stipulation, an order of reference will be made upon proper application.