106 N.J. Super. 358 (1969)
255 A.2d 810
NEW JERSEY TURNPIKE AUTHORITY, PLAINTIFF-RESPONDENT,
v.
H. JEROME SISSELMAN, ET AL., DEFENDANTS-APPELLANTS. NEW JERSEY TURNPIKE AUTHORITY, PLAINTIFF-RESPONDENT,
v.
BERGEN COUNTY ASSOCIATES, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 16, 1969.
Decided July 10, 1969.
*360 Before Judges CONFORD, KILKENNY and LEONARD.
Mr. Walter H. Jones argued the cause for appellants (Mr. Thomas W. Dunn, on the brief).
Mr. Grover C. Richman, Jr., argued the cause for respondent.
The opinion of the court was delivered by KILKENNY, J.A.D.
Defendants appeal from three orders of the Law Division, entered in connection with these condemnation proceedings commenced by the Turnpike Authority. The first two orders, made on April 5, 1968 by Judge Pashman, were based upon orders to show cause and/or motions. The third order was made by Judge Trautwein on October 4, 1968, following a plenary hearing.
Defendants' appeal as to the first interlocutory order of April 5, 1968, is limited to paragraphs (1), (2), (3) and (5) thereof. Paragraph (1) denies defendants' motion for leave to counterclaim for injunctive and other relief. Paragraph (2) strikes the answer of defendants Sisselman and Bergen County Associates, with the exception of such portions of the answer that raise issues of arbitrariness, oppressiveness and bad faith, as to which a plenary hearing was allowed. Paragraph (3) strikes the answer of defendant Borough of East Rutherford with the same exception applicable to paragraph (2), immediately above. Paragraph (5) provides that any construction or preparation of construction of a roadway by plaintiff on Sisselman or Bergen County Associates property after the date of actual full hearing, as provided in paragraph (4), shall be at the risk of plaintiff.
The other interlocutory order of April 5, 1968 denied a motion by defendants for an order compelling the taking of *361 oral depositions of the three Turnpike Authority commissioners.
Judge Trautwein's order of October 4, 1968 was made upon conclusion of a plenary hearing before the judge, sitting without a jury. Based upon the trial judge's oral opinion of September 18, 1968, defendants' motion to dismiss the Turnpike Authority's complaint on the grounds of arbitrariness, oppression and bad faith was denied; defendants' answers raising these questions were stricken, and judgment was entered appointing commissioners for the determination of an award of just compensation. The order contained the addendum that, in conformance with the court's order of April 5, 1968, all construction or preparation for construction of a roadway on the property of defendants, or any of them, up to and including the date of October 4, 1968, "shall have been without risk to the plaintiff."
We note preliminarily that the roadway in issue has been under construction unabated by any injunctive order during all the time in issue, and further construction progresses from day to day.
A summary of the litigation background seems to be in order. In July and August of 1967 the Turnpike Authority instituted condemnation proceedings to acquire two parcels of land in the Borough of East Rutherford, allegedly owned or controlled by defendants, the Sisselmans. The acquisitions were deemed necessary in the public interest for the purpose of building a highway spur from the existing Turnpike at Exit 15 to its northerly terminus, thus by-passing Exit 16, a principal outlet for traffic to and from the Lincoln Tunnel. Such a project was expressly authorized by the Legislature. N.J.S.A. 27:23-23.2, L. 1966, c. 6, § 1, effective February 16, 1966.
In its declaration of taking and pursuant thereto and complaint filed, the Authority deposited into court $286,800 for one of the parcels and $93,000 for the other. The acquisitions of defendants' two parcels were deemed necessary by the Authority because the established alignment of this *362 highway spur required construction of two bridges over Berry's Creek Canal, thus involving the lands in question. These bridges would form an integral part of the planned additional spur.
Defendants contested the Authority's condemnation proceedings. They filed an answer in September 1967 in which they set forth the following separate defenses:
1. The proposed taking was arbitrary.
2. The Turnpike Authority had no power to take the land in question.
3. N.J.S.A. 27:23-1 et seq., creating the New Jersey Turnpike Authority and defining its powers and responsibilities, under which the Authority acted in the instant case, is an unconstitutional delegation of power.
4. The proposed taking violates 33 U.S.C.A. § 401 et seq.

5. The Authority failed to comply with the requirements of N.J.S.A. 40:55-1.13.
6. The complaint failed to state a claim upon which relief could be granted.
7. The complaint was insufficient in law.
In October 1967 defendant sought leave to counterclaim for dismissal and for an injunction against further condemnation proceedings on the grounds enumerated in numbers 4 and 5 above.
We need not detail the various other legal amendments, orders to show cause, motions and affidavits during the following months, all of which led up to hearings before Judge Pashman as to the substantive validity of defendants' answer and proposed counterclaim. Apparently, defenses numbered 2, 3, 6 and 7 had been abandoned. They have not been argued before us. The argument was limited to, and Judge Pashman's decision of January 17, 1968 was concerned only with, defenses numbered 1, 4 and 5. Defenses 4 and 5 were dismissed for reasons hereinafter discussed. Only defense numbered 1, which had asserted arbitrariness, capriciousness, unreasonableness and bad faith on the part of the Authority, *363 was deemed to raise a factual issue requiring a plenary trial thereof. The trial on that limited issue was subsequently conducted before Judge Trautwein, sitting without a jury.
For completeness, we note also that defendants sought leave from Judge Pashman to file a cross-claim against the State, which had been added as a party by reason of the Authority's earlier amendments of its complaint. Defendants sought by its cross-claim a judgment that they held title to all 275 acres of the meadowlands surrounding their parcels and that the State had no title thereto. In an oral opinion on February 19, 1968 the court allowed the filing of the cross-claim, but ruled that it would not be consolidated with the plenary hearing on the issue of arbitrariness and was not to be tried until after the determination of that matter.
In another pretrial motion defendants sought to compel the Turnpike commissioners to appear for oral depositions. Judge Pashman heard this application on March 1, 1968 and ruled that the commissioners were immune from depositions, "barring allegations of improper behavior," which were not present in the case. It was determined that, absent such allegations, "the mental processes of fact-finders are beyond the permissible limits of our discovery procedures."

I
We shall first consider defendants' appeal insofar as it challenges the propriety of the interlocutory orders made by Judge Pashman.

A
As to the four paragraphs in the order of April 5, 1968 striking certain defenses, denying injunctive relief and burdening plaintiff Authority with the risk of proceeding with construction after the date of the plenary hearing, we find no valid basis for a reversal of that order.
Defendants argue in their appeal only as to two of the defenses stricken, namely, (1) their claim that the proposed *364 taking violates 33 U.S.C.A. § 401 et seq., and (2) the Turnpike Authority failed to comply with the requirements of N.J.S.A. 40:55-1.13. We shall, therefore, deem abandoned any claim of error in the striking of the other defenses.

(1) AS TO 33 U.S.C.A. § 401
This statutory reference is to the Federal Harbors and Rivers Act. It provides in pertinent part:
"It shall not be lawful to construct or commence the construction of any bridge * * * over or in any * * * canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: Provided, that such structures may be built under the authority of the legislature of a state across rivers and other waterways the navigable portions of which lie within the limits of a single State, provided the location and plans are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced * * *."
The Turnpike Authority's plans for the highway spur provided for the construction of two bridges across Berry's Creek Canal. Application for the federal permit had been filed with the Corps of Engineers on July 27, 1966, long before filing of these proceedings, but decision on the application had long been delayed. Therein, the Authority sought approval of construction of the two bridges with a fixed vertical clearance of 25 feet. At the time of the hearings before Judge Pashman, federal approval had not yet been obtained. But, at the same time, the Authority had not yet constructed or commenced the construction of the bridges. The contracts then being performed for it involved only the excavation of muck and the subsequent backfill of materials to provide a foundation for the roadway. A public hearing on its application for construction of the bridges was scheduled by the federal authority for January 18, 1968. No contracts for the actual construction of the proposed bridges would be awarded until the grant *365 of the federal permit. The Authority stated that it intended to abide by the vertical clearance requirements prescribed by the federal authorities.
Judge Pashman correctly ruled that, since no construction of an unapproved bridge was then under way, defendants could not prevail on this contention. Moreover, even if the Authority had violated § 401, it would not mandate a dismissal of the condemnation actions.
The federal approval issue has meanwhile become moot. The Turnpike Authority has, in the interim, obtained federal approval for the bridges, subject to the conditions expressed therein. A copy of the bridge permit, dated November 21, 1968, has been made a part of the record before us. The drawings annexed to the permit evidence that the Coast Guard set the vertical clearance at 35 feet, rather than the 25 feet proposed by the Turnpike Authority. The Authority agrees to comply fully with this standard.
Sisselman is now challenging the approval in the federal court. However, the federal administrative determination is binding upon the parties until it is reversed, and an appeal does not suspend its effect. Cf. Emery v. United States, 27 F.2d 992 (E.D. Pa. 1928); Johnson & Johnson v. Herold, 161 F. 593 (C.C.D.N.J. 1907); United States v. United Airlines, Inc., 216 F. Supp. 709, 722-724 (D.C.E.D. Wash. 1962), certiorari dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

(2) AS TO N.J.S.A. 40:55-1.13

N.J.S.A. 40:55-1.1 et seq., constitutes what is known as the "Municipal Planning Act (1953)." Section 1.13 thereof provides in part that a governing body or other public agency, before taking action necessitating the expenditure of any public funds for any project, shall refer the project to the planning board for review and recommendation. The statute makes the requirement applicable "to action by a housing, parking, highway or other authority, redevelopment *366 agency, school board, or other similiar public agency, Federal, State, county or municipal."
Defendants argue that the Turnpike Authority failed to refer its project  the proposed turnpike spur  to the East Rutherford Planning Board for review and recommendation. From this premise, it maintains that the Turnpike's proceedings are fatally defective.
Judge Pashman correctly ruled that this provision in the Municipal Planning Act did not apply once the Legislature has authorized a project such as the Turnpike extension. Such authorization was granted by N.J.S.A. 27:23-23.2 in 1966. The alignment determined by the Turnpike Authority pursuant to that legislative authorization did not require the approval of local planning boards. To hold otherwise would delay, disrupt, fragmentize and possibly defeat completion of this necessary public project, an extensive project passing through several municipalities. That the Turnpike Authority and similar agencies are immune from local zoning and planning regulations has been indicated by such cases as Bloomfield v. New Jersey Highway Authority, 18 N.J. 237, 239-240 (1955); Newark v. New Jersey Turnpike Authority, 7 N.J. 377, 387 (1951); Aviation Services, Inc. v. Board of Adjustment, Hanover Township, 20 N.J. 275 (1956). The rationale of these cases is that legislatively created agencies, authorized by the superior governmental authority of the State, may not be subjected to rules and regulations of local governing boards and agencies, in the absence of clear language subjecting the state-created agency to the jurisdiction of local boards.
The language in N.J.S.A. 40:55-1.13 does not mandate the Turnpike's need to get local approval from the planning board of every municipality through which its extended highway runs. On the contrary, the statute authorizing the Turnpike Authority to perform its designed functions provides:
"This act, being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof." N.J.S.A. 27:23-19. *367 And further, N.J.S.A. 27:23-21 provides:
"All other general or special laws, or parts thereof, inconsistent herewith are hereby declared to be inapplicable to the provisions of this act."
These provisions reinforce Judge Pashman's conclusion that no local consultation or approval of legislatively authorized projects is required.
Accordingly, injunctive relief and dismissal of the condemnation proceedings were properly denied.

B
We now turn our attention to Judge Pashman's order of April 5, 1968, insofar as it denied defendants' motion to take the oral depositions of the three Turnpike Authority commissioners. That denial was based, as noted above, on the premise that they were immune from inquiry into the mental processes by which they made their decisions, in the absence of allegations of improper behavior on their part.
We agree with that determination on the basis of the record herein. United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), expresses the generally accepted rule that the head or heads of an administrative agency may not be examined to probe the mental processes surrounding his or their promulgation of a regulation. Administrative determinations have a quality resembling that of a judicial proceeding. See, too, Braniff Airways Incorporated v. C.A.B., 126 U.S. App. D.C. 399, 379 F.2d 453, 460 (D.C.C.A. 1967).
Moreover, all the facts material to the determination of legality or arbitrariness of the actions of the Authority have been spread upon this lengthy record, and there is no showing that interrogation of the commissioners personally is necessary to enable the correct determination of this litigation.

*368 II
The next issue to be resolved is whether Judge Trautwein's findings of fact and conclusions of law were supported by the evidence and in conformity with applicable legal principles.
The trial was limited to the claim made by defendants that the Turnpike Authority's alignment in the construction of the highway spur was arbitrary, oppressive and done in bad faith. Judge Trautwein concluded that defendants had failed to prove such allegations. Accordingly, judgment was entered in favor of the Authority.
We consider first defendants' claim that they were entitled to the standards of arbitrariness set forth in Texas Eastern Transmission Corp. v. Wildlife Preserves, Inc., 48 N.J. 261 (1966). In that case, a gas company brought proceedings under the authority of the Natural Gas Act to condemn land for a right of way over property owned by Wildlife Preserves, Inc., a private nonprofit eleemosynary corporation engaged in acquisition of lands and their devotion to conservation and preservation of wildlife. Contention was made that there was a sound alternate route for the pipeline. The Supreme Court held that the wildlife corporation was entitled to have a plenary trial of its claim that a satisfactory alternate route was available. It ruled that the gas company could condemn lands devoted to another public use, if the taker's use is necessary to accomplish a public purpose, and that purpose is paramount, either by express language of the statute or by necessary implication therefrom. It noted that the corporation's devotion of its lands for wildlife purposes represented a "unique" case deserving of a more potent claim to judicial protection, involving more than a dollar valuation.
In summary, Justice Francis, on the court's behalf, noted that "the quantum of proof required of this defendant to show arbitrariness against it should not be as substantial as that to be assumed by the ordinary property owner who *369 devotes his land to conventional uses." 48 N.J., at p. 273. However, "the ultimate burden of proving arbitrariness in the choice of route will be on Wildlife Preserves." Id., at p. 275. But if it introduced reasonable proof of (1) serious damage by reason of the path chosen, and (2) an apparently reasonably available alternate route, which would avoid the serious damage referred to, the burden of going forward with the evidence would shift to plaintiff. Id., at p. 275.
Defendants argue that the two parcels in question are unique and specially adaptable for a marine terminal, which would serve a needed public use and, as such, are entitled to the standards of arbitrariness set forth in the Wildlife Preserves case, supra.
The Turnpike Authority's position is that the Wildlife case is distinguishable from the instant situation. In the former, the wildlife preserve was an established fact, in actual existence prior to the gas company's seeking a right of way over the area for the laying of its pipeline. The wildlife preservation involved a public service already being rendered. Here, the marine terminal is not in existence for a public use, but merely something in the contemplation of individuals, who have been engaged in land speculation, the actual development of an industrial park and are contemplating a plan for future development of a marine terminal, as to which there are many contingencies aside from the Turnpike project.
As to the claim of arbitrariness, the Turnpike Authority points out that the proposed roadway route follows a pipeline which has already established the corridor; the Authority's established alignment will result in a reduction in the cost of land acquisitions and construction; it will serve the welfare and safety of the travelling public by selection of the shortest route, and it will provide for the least abrupt curve. A great volume of motorists admittedly use the Turnpike daily. Finally, the Authority allegedly selected this route close to the river bank to provide for natural diking, a factor conducive to the reclamation of meadow lands, a *370 matter presently of deep concern to the State in promoting the public welfare.
The findings by the trial judge justify his conclusion that the rule in the Wildlife case is not applicable here because defendants have not yet with sufficient definiteness undertaken and devoted their property to a marine terminal, as contrasted with the full devotion to public use in Wildlife. Rather, the totality of the evidence on this issue justifies a holding that, as to the burden of proof and of going forward with the evidence, defendants are in the same category of other property owners, as defined in Newark v. New Jersey Turnpike Authority, 7 N.J. 377 (1951).
Defendants, although they now press for a 50-foot clearance of Berry's Creek Canal by the proposed bridge span and at a point 1100 feet west of the proposed location, nevertheless at a meeting with the consulting engineers of the Turnpike Authority on May 11, 1966 suggested a lower span across the canal than the 25-foot vertical clearing in the Authority's application, and at the precise location now proposed by the Turnpike Authority. These proposals would have been inconsistent with their later and present claim of developing the area for a marine terminal. As noted above, the federal authorities, whose judgment controls, fixed permissible vertical clearance at 35-feet.
We need not recite herein the detailed factual findings by the trial judge. Suffice it to say, they are supported by adequate, substantial and credible evidence. We deem them binding upon us. Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 424 (1961). Those findings support the conclusion that the Turnpike Authority was not arbitrary, oppressive or unreasonable, as claimed by defendants. For the reasons stated above, as well as for those set forth in Judge Trautwein's comprehensive opinion, we agree with his judgment. Defendants' dream, "curiously contemporary with the date when the present route was selected by the Turnpike," as Judge Trautwein observed, is subordinate *371 to the paramount and actively progressing public user for needed highway purposes.

III
Defendants' final point is that the Turnpike Authority's continuing its construction pending litigation embarrassed the judicial process by creating its own equities at the expense of defendants.
In the first place, the point is now moot in view of our determination on the merits. In any event, we do not agree with the argument made. The line had been established since 1965, was made public in a prospectus in 1966, at which time underwriters and others became interested in the financing, and on the strength of the planned alignment the public purchased 175 million dollars, or more, of bonds. The work has steadily progressed. To halt operations pending this protracted litigation would entail the loss of millions of dollars, and existing contracts would require renegotiation at ever-increasing costs. Delay while awaiting the end result of the litigation would disserve the public interest. Plaintiff's calculated risk in going forward with the work, absent any legal restraint, was not without justification in the public interest.
The orders and judgment under review are in all respects affirmed.